**In re Kenneth Wayne MYERS and Marjorie Elizabeth Myers, Debtors.**

**COMMONWEALTH OF VIRGINIA COMMISSION OF GAME AND INLAND FISHERIES, Plaintiff,**

v.

**Kenneth Wayne MYERS and Marjorie Elizabeth Myers, Defendants.**

**Bankruptcy No. 84–01527–R. Adv. No. 84–0426–R.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Aug. 28, 1985.

Roger L. Chaffe, Asst. Atty. Gen., Richmond, Va., for plaintiff.

Gary M. Nuckols, Fredericksburg, Va., for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court on May 23, 1985 in a hearing to determine the dischargeability of a debt owed by Kenneth Wayne Myers and Marjorie Elizabeth Myers to the Commonwealth of Virginia. The plaintiff bases the challenge to dischargeability on § 523(a)(4) of the Bankruptcy Code, which renders nondischargeable debts incurred by fraud or defalcation while in a fiduciary capacity, embezzlement, or larceny. The Court took the matter under advisement and requested the parties to file briefs on the issues. The briefs having been filed, and having reviewed the record and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The debtors herein, Kenneth Wayne Myers and Marjorie Elizabeth Myers, husband and wife, operated together a business in King George County, Virginia, known as "K & M Sporting Goods." The Myers applied to the Division of Game and Inland Fisheries of the Commonwealth of Virginia in order to be an agent for the sale of hunting and fishing licenses at their place of business. The application was approved on June 14, 1983. The debtors were to sell the licenses and remit the proceeds, less commissions, back to the Commonwealth. Under Virginia Code § 29-69, the debtors were allowed a twenty-five cent commission for every license sold.

An audit by the Commonwealth showed that the Myers failed to remit license sales proceeds from the 1983 and 1984 hunting and fishing seasons in the total amount of $9,823.75. The Commission of Game and Inland Fisheries made several requests to the debtors that they remit the funds due the Commonwealth, however, the Myers were unable to do so. As the facts developed at the hearing, it became apparent that the Myers' business took a downswing and the money received from the license sales was applied toward business expenses and the purchase of additional inventory. The fees due the Commonwealth were not segregated or kept in a separate account, but were combined with other revenues from which the general business debts were paid. Once it became clear the Myers could not meet their obligations, the Commonwealth brought suit in the Circuit Court of King George County and obtained a default judgment against the debtors on August 30, 1984.

The debtors filed a Chapter 7 petition with this Court, and listed the plaintiff in this suit as a creditor therein. Accordingly, the plaintiff seeks a determination as to the dischargeability of the $9,825.75 due the Commonwealth of Virginia. The Commonwealth argues two separate grounds for nondischargeability; first, a breach of fiduciary duty,[1] and second, embezzlement.

---

1. The plaintiff asserted that this Court should be bound by the issues determined in the state

court proceeding, and that the debtor in this case is barred by the doctrine of collateral es-

Both grounds are contained in Bankruptcy Code § 523(a)(4).

## CONCLUSIONS OF LAW

### I. *Defalcation in Fiduciary Duty.*

The Code provides that "a discharge … does not discharge an individual debtor from any debt … (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny …" 11 U.S.C. § 523(a)(4). Addressing the defalcation argument first, there must be a showing that the debtors in this case stood in a fiduciary relationship with the Commonwealth.

As the plaintiff in this case has argued, the bankruptcy courts have developed a narrow interpretation of what constitutes a fiduciary relationship under the Bankruptcy Code. In *Matter of Angelle*, 610 F.2d 1335, 1341 (5th Cir.1980), the Fifth Circuit stated that the "scope of the concept fiduciary under [11 U.S.C. § 523(a)(4)] is exclusively a question of federal law." [2] *See also Matter of Rausch*, 49 B.R. 562 (Bankr.D.N.J.1985). Accordingly, the standard that has developed at the bankruptcy level under § 523(a)(4) is such that there must be a "technical" or express trust, and not merely an implied trust or an agency relationship. *In re Barwick*, 24 B.R. 703, 705 (Bankr.E.D.Va.1982); *see also In re Gagliano*, 44 B.R. 259 (Bankr.N.D.Ill.1984); *American Insurance Co. v. Lucas*, 41 B.R. 923 (D.C.W.D.Pa.1984). Should an express trust exist, § 523(a)(4) does not require any intentional wrongdoing on the part of the debtor which would give rise to fraud, embezzlement or misappropriation. Indeed, a defalcation may exist where the debtor has misapplied funds held by him as a fiduciary under the belief that he is authorized to do so. *Barwick*, 24 B.R. at 706; *Lucas*, 41 B.R. at 925. However, until an express or technical trust is shown, no fiduciary relationship will exist under § 523(a)(4).

A recent case applying these established rules to the situation at hand is *American Insurance Co. v. Lucas*, 41 B.R. 923 (D.C. W.D.Pa.1984). The facts in *Lucas* are nearly identical to those considered here. The debtors in *Lucas* were a husband and wife operating a sporting goods store in Pennsylvania. Like the Myers in Virginia, the Lucases applied for permission to sell hunting and fishing licenses and remit the proceeds, less commissions, to the Commonwealth of Pennsylvania. The Pennsylvania statute authorizing such a delegation required the issuing agent to remit the balances from sales of the licenses to the state treasurer at the end of the month. *Id.* at 924.

The facts in *Lucas* state that the debtors commingled funds from the license sales with other income from the store, and the funds were applied to the general operating expenses of the store as a whole. In time, the debtors were unable to meet their obligations. The district court held in an order affirming the bankruptcy court that absent an express statutory intent to create a trust relationship, there was no fiduciary relationship between the Commonwealth and the debtors. Moreover, "in the

---

toppel from denying there was a breach of fiduciary duty. However, the doctrine of collateral estoppel only precludes relitigation of issues actually and necessarily decided, and it is well established that a state court default judgment does not have collateral estoppel effect because it is not the result of actual litigation. *In re Anderson*, 49 B.R. 655, 656 (Bankr.W.D.Wis. 1984); *In re Graziano*, 35 B.R. 589, 595 (Bankr. E.D.N.Y.1983); *In re Hall*, 31 B.R. 148, 149 (Bankr.W.D.Okl.1983).

Moreover, a state court may determine the defendants' liability on a debt, but the federal courts will determine its dischargeability under the bankruptcy laws. A federal bankruptcy court has the authority and the right to inquire

into the character, and, ultimately, the dischargeability of the debt notwithstanding the state court determination. *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377 (5th Cir.1980); *see also In re Graziano*, 35 B.R. 589, 595 (Bankr.E.D.N.Y. 1983).

**2.** In *Matter of Angelle*, the court specifically referred to § 17(a)(4) of the Bankruptcy Act of 1898, which was repealed by the Bankruptcy Code of 1978. Section 17(a)(4) was replaced by 11 U.S.C. § 523(a)(4). *Matter of Rausch*, 49 B.R. 562, 563 (Bankr.D.N.J.1985); *In re Barwick*, 24 B.R. 703, 705 (Bankr.E.D.Va.1982). The former provision is substantially the same as current § 523(a)(4).

absence of such express legislative action, these debts cannot be held nondischargeable." *Id.* at 926.

The plaintiff here, as did the plaintiff in *Lucas*, argues that the statute empowering the state to appoint agents for the sale of licenses implies the necessary trust relationship. Yet, without an express intent in the statute no express trust can exist. The enabling statutes, in §§ 29–65 to 29–73 of the Virginia Code, outline the various duties, responsibilities, and penalties pertaining to the issuing agents. However, there is no intent in the statutes which, on their face, would create a fiduciary relationship between the debtor and the Commonwealth. For dischargeability purposes, the statutory scheme created no more than an agency relationship.

The plaintiff has also argued that the existence of a criminal statute applicable to a public officer misappropriating funds creates an express trust for § 523(a)(4) purposes.[3] The plaintiff cites *In re Loken,* 32 B.R. 205 (Bankr.W.D.Wis. 1983) as authority for the creation of this duty. However, it is this Court's belief that a statute which makes the act of misappropriation of funds a crime, without requiring those funds to be segregated at the outset, is not sufficient to charge the parties with an intent to create an express trust. *Matter of Rausch,* 49 B.R. 562, 565 (Bankr.D.N.J.1985). Moreover, assuming such a statute does create a trust, the trust would arise out of the misappropriation and would not exist before the wrongful act occurred. As this Court has held previously, a trust imposed *ex maleficio* is insufficient to give rise to the existence of a fiduciary relationship for the purposes of

bankruptcy law. *In re Barwick,* 24 B.R. 703, 705 (Bankr.E.D.Va.1982).

On the basis of these considerations, this Court is of the opinion that no fiduciary relationship existed between the Commonwealth and the debtors which would warrant nondischargeability under § 523(a)(4) as a defalcation in fiduciary duty.

## II. *Embezzlement.*

11 U.S.C. § 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by an act of embezzlement is nondischargeable. *In re Rigsby,* 18 B.R. 518, 520 (Bankr.E.D.Va.1982). The federal definition of embezzlement for dischargeability purposes is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Moore v. United States,* 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895); *In re Barwick,* 24 B.R. 703, 706 (Bankr.E.D.Va.1982). Such a showing must be proven by clear and convincing evidence. *Rigsby,* 18 B.R. at 521.

Even where a case might imply some form of trust by virtue of a debtor holding funds for another, the debtor's subsequent appropriation of the funds will not amount to an embezzlement absent proof of the debtors' fraudulent intent. *Matter of Storms,* 28 B.R. 761, 765 (Bankr.E.D.N. C.1983). Moreover, the fraudulent intent which is a prerequisite to finding an embezzlement under § 523(a)(4) may be negated by the fact that the debtor used such funds openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use.[4] *Id.*

---

**3.** Va. Code Ann. § 18.2–112 (Repl.Vol.1975) provides as follows:

If any officer, agent or employee of the State or of any city, town, county, or any other political subdivision, or the deputy of any such officer having custody of public funds knowingly misuse or misappropriate the same or knowingly dispose thereof otherwise than in accordance with law, he shall be guilty of a Class 4 felony; and any default of such officer, agent, employee or deputy in paying over any such funds to the proper authorities when required by law to do

so shall be deemed prima facie evidence of his guilt.

**4.** At trial, Mrs. Myers testified that she thought the funds derived from the license sales belonged to the Commonwealth; however, her thoughts on the matter are not dispositive. Consistent with this Court's ruling in *Rigsby,* the actions of the parties speak louder than their words. *Rigsby,* 18 B.R. at 521. Regardless of who the funds belonged to, the open commingling of the license proceeds with other funds

This Court in *In re Rigsby*, 18 B.R. 518, 521 (Bankr.E.D.Va.1982) applied a similar analysis and was cited with approval in *Storms*. In *Rigsby* the defendants sold products as a consignment dealer for Snap-On, a nationally known manufacturer of tools. The defendant, Rigsby, sold the goods directly to garage and service station mechanics. Under the agreement between Rigsby and Snap-On, the tools remained the property of Snap-On and the proceeds, less commissions, belonged to Snap-On as well. This Court held, notwithstanding the agreement between the parties, that the actions of the parties controlled. Rigsby was not required to isolate the funds in a separate account, nor did he have a restricted use of the funds. *Id.* at 521. Specifically, the court determined that Snap-On, as a consignor, was no more than an unpaid creditor. The decision implied that when there is an unfettered use of such funds, an alleged entrustment relationship between the parties should be viewed with a critical eye.

*Rigsby* based its decision in part upon *In re Williams*, 7 B.C.D. 45 (W.D.Va.1980). In *Williams*, the defendant entered into a commission agreement to sell gasoline for the plaintiff. The plaintiff was to retain title to the gasoline until it was sold by the defendant, who was to remit the proceeds, less his commissions, back to the plaintiff. The defendant defaulted, and the court concluded that "[t]he default by failure of defendant to remit sales proceeds ... is an open account in debt and not an obligation for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny within the meaning of ... 11 U.S.C. § 523(a)(4)." *Id.* at 47. The facts in the present situation would tend to indicate a lack of an entrustment agreement given *Rigsby* and *Williams*. The money received by the debtors was not required to be segregated or kept in a separate account. In the letter from the Commission of Game and Inland Fisheries which appointed Mr. Myers an agent, Administrative Officer Putt stated that the Commission "urged"

the defendant to place the funds in a separate account. However, there was no requirement to segregate nor was there a penalty for failure to do so.

In addition, there was no restriction on the use of the funds. Mrs. Myers testified that the license proceeds went straight into the cash register, and vendors were paid cash as they came into the store. It appears from the evidence that as long as the Commonwealth received a check from the debtors covering the amount due, it made no difference as to the manner in which the funds were maintained. A similar conclusion was arrived at in the *Storms* decision. *Storms*, 28 B.R. at 765.

In *Storms*, an insurance agent received premiums from policies sold, and he was required to pay the balance, less commissions, to his insurance company. The court pointed out that the debtor routinely and openly commingled premiums with the funds of other business and operated from a single bank account. Upon the debtor's default, the court rejected the argument that a § 523(a)(4) embezzlement took place stating, "as insurance premiums came into Storms' hands, he was not required to isolate or account for them, nor was there any restriction on his use of them. Great American's only apparent concern with respect to premiums was that Storm's account be paid by November 15." *Id.* at 765.

This Court finds that there is no substantive difference between the insurance premiums received by the debtor in *Storms* and the license proceeds received by the Myers in the present case. In one instance the money is given in exchange for an insurance contract issued by the company, in the other, the money is given for a license issued by the Commonwealth. In both cases, however, the debtors received money that was to be remitted to another party once the debtors' sales commissions were deducted. In the present case, the

and the payment of general business debts out of the common receipts indicates that the debt-

ors had a "reasonable belief" that they had the right to use the funds for business purposes.

deprived party happens to be the Commonwealth of Virginia and not the Great American Insurance Company.

Regardless of what the understanding may have been between the parties as to the treatment of the funds, the actions of the debtors and the Commonwealth refute any assertion that there was an embezzlement. The Myers' unfettered use of the funds in their possession indicates a lack of an entrustment agreement or a fraudulent appropriation. The facts and the *Rigsby* and *Storms* decisions show that the Myers were lawfully entitled to use the funds, and their duty to pay the Commonwealth was based solely upon their obligations as a debtor. One cannot embezzle one's own property. *In re Schultz*, 46 B.R. 880, 890 (Bankr.D.Nev.1985). As a result, this Court finds that there was no fraudulent deprivation of the Commonwealth's funds, and, therefore, no embezzlement under § 523(a)(4) which would bar discharge of the debt.