In the Matter of Donald WEBER and Roxanne Weber, Debtors.

Appeal of Michael C. ABLAN, Creditor.

No. 89–1342.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1989.

Decided Dec. 21, 1989.

Michael C. Ablan, LaCrosse, Wis., pro se.

Richard Thompson, Phelps, Thompson & Koby, LaCrosse, Wis., for defendants-appellees.

Before WOOD, Jr., COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff Michael Ablan wanted a debt with defendant Donald Weber [1] to be classified as nondischargeable in bankruptcy because, Ablan alleged, the debt arose when Weber embezzled proceeds of a sale from him. Ablan appeals the district court's affirmance of the bankruptcy court's finding that Weber lacked the fraudulent intent required for embezzlement under 11 U.S.C. § 523(a)(4).

## I. Factual Background

Earlier litigation in this case established certain facts with respect to the transactions in question and the bankruptcy court held that the parties were estopped to deny them. The parties do not challenge this ruling, nor do they dispute the occurrence of the following events.

In early 1981, Ablan purchased 38 cows as a tax-favorable investment and leased them to Weber Farms. Weber, as president of Weber Farms, subsequently entered into a sales contract with Baker Farms to sell 130 cows (including Ablan's 38). The sales contract with Baker Farms did not disclose Ablan's ownership interest. In August 1981, Ablan became aware of

---

**1.** Roxanne Weber, Donald Weber's wife, was named a defendant in this case, but no evidence was introduced at trial that connects her with any of the events in this litigation. References to "Weber," therefore, designate Donald Weber alone.

the pending sale, and although he did not stop the sale, it is clear that he did not want to realize a sale in 1981 because of adverse tax consequences.

The sale was consummated and Weber received $195,000 for the 130 cows. Weber first received $50,000 as a down payment. He gave Ablan $5,000 of the down payment and applied $40,000 of the balance to a pre-existing business debt with the Westby–Coon Valley State Bank.[2] When Weber received the remaining $145,000, he placed the money in the Weber Farm's account at the Bank and authorized the Bank to apply $113,000 of the deposit to a business debt of Weber Farms. Weber subsequently used the remaining $32,000 to pay pre-existing business and personal debts.

In 1983, Ablan sued the Bank in state court alleging that it wrongfully applied his sales proceeds to Weber Farm's debt. The state court held, however, that the Bank did not know of Ablan's claim to the proceeds because neither he nor Weber notified the Bank of their respective interests. The court also held that Ablan was fully aware of the sale, did not veto it, and told Weber that, in order to avoid tax consequences, he did not want to receive any of the proceeds until 1982. The court reasoned that Ablan was under a duty to protect his proceeds and that he should have notified the Bank of the true situation. Since Ablan failed to do so, knowing the relevant events that were occurring at the Bank, he could not now allege that the Bank was at fault. The court therefore dismissed Ablan's complaint.

Weber subsequently filed for bankruptcy under Chapter 7. In January 1985, Ablan petitioned the bankruptcy court to have his debt with Weber declared nondischargeable under section 523(a)(4). The bankruptcy court, 81 B.R. 482, accepting the state court findings as true, entered summary judgment for Weber on the ground that Ablan's knowledge of Weber's conduct precluded a finding that Weber acted fraudulently. On appeal, the district court reversed, holding that a finding of "knowledgeable acquiescence" on Ablan's part did not preclude Ablan from proving that Weber acted fraudulently. The court held that a creditor's knowledgeable acquiescence was relevant evidence in disproving that the debtor acted with fraudulent intent, but the existence of such evidence did not absolutely foreclose a finding that the debtor, in fact, embezzled.

On remand, the bankruptcy court held a bench trial and subsequently entered judgment for Weber. As the bankruptcy court noted, the sole issue for trial was whether Weber possessed the requisite fraudulent intent when he used Ablan's proceeds for his own debts.

Evidence adduced at trial revealed that Ablan and Weber were close friends and that Ablan, an attorney, had represented Weber in various matters both before and after the sale of the cattle. In early 1981, Weber offered Ablan an opportunity to invest in the dairy cows. Ablan would be able to depreciate the cows over time and get a tax benefit; Weber would be able to increase the milk yield of his farm so that Weber's bank would lend him money for a new, larger barn. The bank refused to finance the barn expansion, however, and Weber decided that the best course of action was to sell the whole herd before winter. When Ablan learned of the pending sale, he made it clear to Weber that he could not report a sale of his cows in 1981 because of tax repercussions. After Weber sold the cows, Ablan did not, in fact, report the sale on his tax returns; instead, he continued to depreciate the cows and continued to receive monthly lease payments from Weber for nearly three years. Weber stopped making payments in April 1984, shortly before he filed bankruptcy.

Testimony at trial differed sharply on what the parties agreed to do with the sales proceeds. According to Ablan, Weber told him he put Ablan's proceeds in a CD account and would turn the money over in January 1982. Ablan also testified that he

---

**2.** The remaining $5,000 is apparently unaccounted for. Neither the bankruptcy court nor the district court discusses its whereabouts.

was aware of Weber's precarious financial situation and the possibility that Weber would file bankruptcy. According to Weber, Ablan never gave him any specific instructions to segregate the proceeds nor did Weber offer to do so. Weber also testified at trial that he and Ablan discussed whether unpledged collateral at the Weber Farm was available to secure Ablan's investment in the cows.

Based on this evidence, the bankruptcy court held that Weber lacked fraudulent intent under section 523(a)(4). The court found that although Ablan never gave Weber direct authority to dispose of the sales proceeds, he did give "tacit assent to Weber's continued possession and control of the proceeds." This assent was motivated by Ablan's concern about his taxes; the court found that Ablan "took steps to preserve the fiction that the cows were not sold for a considerable time." The court also found that Weber sold the cows for his own benefit without any regard for Ablan. And on the central issue of fraudulent intent, the court held that "Weber acted recklessly in disregarding Ablan's rights to the proceeds from the sale of cows but he did not intend to deprive Ablan of the proceeds of the sale or their equivalent." The court concluded that Ablan failed to prove by clear and convincing evidence that Weber "possessed an intention to defraud or acted with deceit required under section 523(a)(4)."

On appeal, the district court affirmed on the ground that the bankruptcy court's finding of fact as to Weber's intent was not clearly erroneous.

## II. Jurisdiction

To determine whether we have proper jurisdiction in this case, we ask two questions: (1) did the bankruptcy court enter a final order that could be appealed to the district court?; and (2) did the district court then enter a final order appealable to us? In regard to the first question, we held in *In re Riggsby*, 745 F.2d 1153, 1154 (7th Cir.1984), that "the dismissal by the bankruptcy judge of a complaint objecting to the discharge of the bankrupt [under sec-

tion 523(c)] is final" for purposes of the district court's jurisdiction. The court reasoned: "The proceeding that such a complaint kicks off has traditionally been treated as a separate adversary proceeding within the framework of the overall bankruptcy case and ... Congress in overhauling the system of bankruptcy appeals in the 1978 act apparently meant to continue the former practice whereby orders disposing of such proceedings were appealable as final orders." *Id.*

Addressing the second question, the *Riggsby* court noted that the district court disagreed with the bankruptcy court's determination and reversed and remanded the case to the bankruptcy court for further proceedings. The creditor then attempted to appeal this remand order to us and we held that this district court order was not final and appealable. *Id.* at 1155. The court reasoned that it was more efficient to wait for the bankruptcy court to conclude the case, and thereby possibly avoid an appeal, than to decide the appeal ourselves and risk two appeals and further delays. *Id.* at 1155–56.

■ Applying this analysis to our facts, Ablan filed a petition in an adversary proceeding that would qualify as "traditionally ... separate" under *Riggsby*. This is true because once determination of dischargeability is made, the dispute between these two parties is for all practical purposes over. If the debt were held dischargeable, all Ablan would have to do would be to await "get[ting] a part of his debt repaid out of the assets of the estate," and thus the litigation was final enough to appeal. *Id.* at 1155; *see also In re Sandy Ridge Oil Co.*, 807 F.2d 1332, 1334 (7th Cir.1986) (when one creditor's position is finally determined, the bankruptcy order is final). If it were held nondischargeable, Ablan would retain the right to sue for full reimbursement of his debt with Weber. Thus, the bankruptcy court entered a final order appealable to the district court.

■ The answer to the second *Riggsby* question in our case does not defeat jurisdiction. Where in *Riggsby* the district court reversed and remanded the order to

the bankruptcy court for further proceedings, in our case the district court affirmed. When an order is remanded to the bankruptcy court, a determination must be made whether the remand requires further attention by the court (therefore making it nonfinal, *see In re Goldblatt Bros. Inc.*, 758 F.2d 1248, 1250 (7th Cir.1985)), or whether the remaining work to be done is merely ministerial (making the order final and appealable despite its direction to remand, *see In re Fox*, 762 F.2d 54, 55 (7th Cir.1985)). But in cases like ours where the bankruptcy court is affirmed, "the affirmance [is] a final decision appealable to us." *Id.* Thus, we have jurisdiction over the district court's decision as well.

### III. Standard of Review

■ The standard of review for factual findings is provided in Bankruptcy Rule 8013: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."[3] Caselaw under Fed. R.Civ.R. 52(a)[4] provides several general guidelines for applying the clearly erroneous standard. The standard does not permit a trier of fact to be overturned "simply because [the appellate court] is convinced it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Instead, where two

permissible conclusions may be drawn, the factfinder's choice cannot be clearly erroneous. *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir.1988). Special deference must be accorded to credibility determinations "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512.[5]

### IV. Analysis

#### A.) Embezzlement

■ Section 523(a)(4) of the bankruptcy code does not allow a debtor to discharge a debt incurred as a result of the debtor's embezzlement. Bankruptcy courts define embezzlement as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895), *quoted in In re Bevilacqua*, 53 B.R. 331, 333 (Bankr.S. D.N.Y.1985), *In re Myers*, 52 B.R. 901, 905 (Bankr.E.D.Va.1985), *In re Graziano*, 35 B.R. 589, 594 (Bankr.E.D.N.Y.1983); *see also In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988). To prove embezzlement, the creditor must show by clear and convincing evidence that (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. *In re Taylor*, 58 B.R. 849, 855

---

**3.** Ablan thus characterizes the issue as follows: "Was the district court's holding itself clearly erroneous in concluding that the Bankruptcy Court's decision ... was not clearly erroneous?" Our review of facts under the clearly erroneous standard, however, extends not to the district court's decision, but to the findings of fact made by the bankruptcy court itself. *In re First Wisc. Nat'l Bank v. Federal Land Bank of St. Paul*, 849 F.2d 284, 286 (7th Cir.1988); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985).

**4.** Bankruptcy Rule 7052 provides that "Fed.R. Civ.P. 52 applies in adversary proceedings."

**5.** Ablan argues that our scope of review should be broader in this case because the parties agree on the basic facts but disagree on the inferences to be drawn from these facts. We have held that a broader scope of review is appropriate

under such circumstances. *Hylin v. United States*, 715 F.2d 1206, 1215 (7th Cir.1983), *vacated on other grounds*, 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984). We held in *Hylin*, however, that the narrower scope of review still applied " ' "where disputed evidence and questions of credibility are involved." ' " *Id.* (quoting *Yorke v. Thomas Iseri Produce Co.*, 418 F.2d 811, 814 (7th Cir.1969), quoting *Mayo v. Pioneer Bank & Trust Co.*, 297 F.2d 392, 395 (5th Cir. 1961)). Weber counters by arguing that the bankruptcy court relied on the testimony of the parties to base its finding of recklessness and that this testimony was "widely divergent." It seems clear that in light of the conflicting testimony as to parties' motives, understanding and ultimate intent, the evidence was in conflict and witness credibility weighed heavily in the mix. Thus, the broader scope of review is unwarranted on our facts.

(Bankr.E.D.Va.1986); *In re James*, 42 B.R. 265, 267 (Bankr.W.D.Ky.1984); *In re Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C. 1983); *Graziano*, 35 B.R. at 595.

Ablan initially argues that the bankruptcy court should have applied the embezzlement and conversion laws of Wisconsin. Although he cites no authority for this proposition, and admits that ultimately the issue of nondischargeability is a question of federal law, he claims that state law is "useful" in defining the elements of embezzlement. Ablan claims that the Wisconsin cases he cites "do not in any event conflict with the [federal standards]"; his analysis of this caselaw, however, leads him to conclude that "[t]he act of depositing [another's] funds into one's account, thereafter causing them ... to be dispersed for one's own purposes or uses is the kind of evidence which *would compel the conclusion that embezzlement has occurred.*" (emphasis added). Under federal law, such a conclusion is not compelled since the creditor must also prove that the dispersal occurred with fraudulent intent. Thus, Ablan had to prove more than just the fact that Weber used the sales proceeds to pay off his personal debts; he had to prove that Weber did so with fraudulent intent.

■ Applying the appropriate federal standards, the bankruptcy court concluded that Ablan failed to meet his burden of proof on the issue of fraudulent intent. Ablan insists that Weber's fraudulent intent was objectively manifested and that a review of the record reveals that the bankruptcy court's findings of fact "are entirely implausible." For example, Ablan argues that Weber never told the Bank that a portion of the proceeds belonged to Ablan and that this shows Weber's fraudulent intent. The bankruptcy court agreed with Ablan that Weber failed fully to disclose Ablan's interest to the Bank, but found that Ablan likewise failed to notify the Bank of his interest in the proceeds.

Ablan also argues that it is implausible that he would have consented to having Weber use the proceeds as Weber saw fit given Ablan's knowledge of Weber's precarious financial state. Given the testimony at trial regarding Ablan's tax concerns, however, the bankruptcy court was not clearly erroneous in concluding that Ablan tacitly assented to Weber's possession and control of the money because Ablan wanted to continue to receive the tax benefits of his investment. *See Sears, Roebuck & Co.*, 839 F.2d at 309 (acceptance of one of two permissible conclusions not clearly erroneous).

Ablan has not shown why the bankruptcy court's conclusion is not permissible; he seems to argue instead that his evidence was more credible than Weber's. Given the bankruptcy court's finding that neither party "was completely forthright" in testifying, this is not a powerful argument. Nonetheless, Ablan fails to show that the bankruptcy court's acceptance of Weber's plausible alternative was clearly erroneous.

B.) Knowledgeable Acquiescence

■ The bankruptcy court supported its denial of Ablan's petition with findings that Ablan knew all the material details of the events in question and did not object to them. Under the knowledgeable acquiescence doctrine, bankruptcy courts have held that a finding of fraudulent intent "may be negated by the fact that the debtor used such funds openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use." *In re Myers*, 52 B.R. 901, 905 (Bankr.E.D.Va.1985); *In re Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C.1983); *see also In re Gumieny*, 8 B.R. 602, 606 (Bankr.E.D.Wisc.1981). As the district court correctly noted, the rule is not mandatory. Thus, evidence of the creditor's knowledgeable acquiescence is relevant to whether the debtor had the requisite fraudulent intent, but neither dictates nor precludes a finding that the debtor had the necessary intent.

The district court held that Ablan's tacit assent to Weber's continued, unconditioned control of the proceeds, as well as the parties' discussion of securing Ablan's investment with Weber Farm's collateral, could reasonably have led Weber to believe that there were no restrictions on use of

540

the proceeds. This acquiescence was relevant to the question whether Weber had the requisite intent to defraud Ablan. Ablan argues that this inference is incredible because Ablan knew that Weber was in a precarious financial position and would not have allowed Weber to control the proceeds. However, given that the two were good friends and there was evidence that they had discussed securing the proceeds with Weber Farm's collateral, the inference is not clearly erroneous and was properly used as support for negating the existence of fraudulent intent.

In sum, Ablan has failed to show that the bankruptcy court was clearly erroneous in finding that Weber lacked fraudulent intent. The decision of the district court affirming the bankruptcy court's opinion is therefore AFFIRMED.