In re James E. MONROE and, Taylor M. Monroe, Debtors.

CFC Wireforms, Inc., Plaintiff

v.

James E. Monroe and Taylor M. Monroe, Defendants.

Bankruptcy No. 00 B 25718.
Adversary No. 01 A 00583.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 2, 2004.

Samuel G. Levin, Hinshaw & Culbertson, Lisle, IL, for Plaintiff.

Harold M. Saalfeld, Chicago, IL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the filing by Mr. James Monroe ("Debtor" or Monroe") and Ms. Taylor Monroe under Chapter 7 of the Bankruptcy Code. Prior to that filing, Monroe was president of an Illinois corporation known as Technology Resources, Inc. ("TRI"), a commercial lessor and financier of heavy duty manufacturing machinery. A former customer of TRI, Plaintiff CFC Wireforms, Inc., filed this action to bar dischargeability of debt under 11 U.S.C. § 523(a)(2) and § 523(a)(4) for funds advanced for the purpose of leasing and financing certain machinery. Following trial, the Court now makes and enters the following Findings of Fact and Conclusions of Law, pursuant to which judgment is separately entered in favor of Defendant James Monroe.

### PROCEDURAL HISTORY

CFC Wireforms, Inc. filed this Adversary against Mr. Monroe and Ms. Taylor Monroe alleging fraud, false pretenses and false representations under 11 U.S.C. § 523(a)(2) (Count I), fraud or defalcation in a fiduciary capacity, embezzlement or larceny under § 523(a)(4) (Count II), and fraudulent conveyance under § 548 (Count III). After CFC rested its case-in-chief, Debtors made a motion for judgment on partial findings under Rule 52(c) Fed. R.Civ.P. [Rule 7052 Fed.R.Bankr.P.]. Findings of Fact and Conclusions of Law were recited in open court from the bench and a separate judgment order was entered in favor of both Mr. and Ms. Monroe as to Count III, and Ms. Monroe was then

dismissed from this Adversary proceeding. *See* Judgment Order—Count III, May 28, 2003. The parties proceeded to the conclusion of trial against Mr. Monroe under Counts I and II. Findings of Fact are based on evidence admitted and stipulation of the parties as to uncontested facts, and pertain only to Counts I and II.

### FINDINGS OF FACT

1. CFC Wireforms, Inc ("CFC") is an Illinois corporation located in Batavia, Illinois and manufactures various metal products and machinery components.

2. In late 1993 or early 1994 CFC entered into discussions with an equipment supplier, North America OMCG ("OMCG"), for OMCG to custom manufacture a commercial stamping machine called the CNC–20. Stipulation of Uncontested Facts at 2 ¶ 8. As the parties negotiated the pricing and specifications of the CNC–20, OMCG referred TRI to CFC as an entity that could provide assistance to CFC with needed financing.

3. From 1980 to 1995, TRI was an Illinois corporation in the business of leasing and financing heavy duty manufacturing machinery. Def.'s Am. Prop. Findings of Fact and Concl. of Law at 3 ¶ 2. At all times mentioned here, TRI had three employees, Debtors James Monroe and his wife Taylor Monroe, and a secretary. Monroe Tr. 5/13/03 at 145 [1].

4. TRI's business involved two transactions. First, TRI would obtain financing for equipment selected by one of its customers from an equipment supplier, then TRI and the equipment supplier would enter into a contract providing for purchase and delivery of the machinery. Second, TRI would enter into an agreement to lease the equipment to its customer. The lease agreement would include the total principal required to finance the equipment, and TRI would assign its payment right under the lease to a financial institution. TRI realized profit from the difference between the favorable interest rate charged to it and the higher interest rate charged to the customer by the financial institution. Monroe Tr. 5/27/03 at 66–68.

5. At times mentioned herein, Monroe served as TRI's president and had exclusive decision-making authority for the transaction with CFC, as admitted in Def.'s Prop. Findings of Fact and Concl. of Law at 2 ¶ 1. TRI agreed to assist CFC in securing financing, and on December 23, 1994 Monroe met with a representative from CFC, Mr. Frank Czekajlo ("Czekajlo"). At that meeting, Monroe explained the mechanics of TRI's business and the provisions of TRI's standard contract agreement, termed a "Quotation and Agreement." Monroe Tr. 5/22/03 at 138. Mr. Czekajlo signed the Quotation and Agreement on CFC's behalf on December 23, 1994. Pl.'s Trial Exh. 12.[2]

6. The Quotation and Agreement stated that the total cost of the CNC–20 would be $435,000, paid in installments each in the amount of $7,961.18 over a period of sixty months, but further provided that if the cost of machinery changed a corresponding adjustment in payments would be made. The parties agreed upon a funding date prior to January 30, 1995. The agreement also required a $68,000 payment described by the parties as a prepaid "purchase option." Pl.'s Trial Exh. 12.

7. The Quotation and Agreement included several contingencies that had to be fulfilled before the agreement became

---

**1.** "Monroe Tr." refers to transcript of Mr. Monroe's trial testimony

**2.** "Pl.'s Trial Exh." and "Def.'s Trial Exh." refer to the Plaintiff's and Debtor–Defendants' exhibits admitted at trial.

binding including TRI's approval of CFC's credit, disclosure of certain documentation, a guaranty of the parties, and acceptance of an eventual purchase order by the equipment supplier. The agreement also required a deposit of the first and last regular monthly payments, plus a $100 credit documentation and filing fee, a total of $31,944.72 ("deposit funds"). Pl.'s Trial Exh. 12.

8. Pursuant to the agreement, CFC tendered the "deposit funds" and the "purchase option" payment to TRI. Monroe deposited the "deposit funds" in TRI's operating account at First American Bank. Pl.'s Trial Exh. 64. Monroe deposited the "purchase option" funds in a second TRI account at Park National Bank ("Park Bank"). Pl.'s Trial Exh. 21.

9. While CFC and OMCG continued negotiations as to the final specifications and pricing of the CNC–20, Monroe submitted a purchase order on CFC's behalf to OMCG for the machinery. OMCG received the purchase order and the purchase option funds on January 4th and January 10th, 1995. Stip. Uncontested Facts at 2 ¶¶ 14–17.

10. Upon completion and delivery of the CNC–20, it was originally intended by the parties that TRI and CFC enter into a lease agreement whereby TRI would hold title to the CNC–20 in exchange for periodic payments specified in the Quotation and Agreement. TRI was to assign its rights in the lease payments to Park Bank. However, CFC and TRI never entered into a lease agreement.

11. TRI further intended that Park Bank would provide long term financing for the CNC–20 through a loan. TRI submitted a financing proposal to Park Bank, and on December 22, 1994, the Bank's Executive and Loan Committee approved the proposal subject to review of additional financial statements and the acceptance of a specified interest rate. Pl.'s Trial Exh. 60; Gorski Tr. at 91. However, Park Bank did not ultimately provide financing for CFC's purchase of the CNC–20. No final loan agreement, note, or related documents were approved or executed.

12. After receiving the initial installment payments, OMCG started production of the CNC–20 according to CFC's specifications.

13. However, production of the CNC–20 did not proceed as planned. On October 19, 1995 CFC sent a letter to OMCG expressing frustration with delays in the progress of the machinery, cancelling the purchase order and requesting a return of all funds paid with the purchase order. Pl.'s Trial Exh. 25. CFC subsequently requested the return of the deposit funds from TRI. TRI refused to make any repayment. Czekajlo Tr. 5/22/03 at 23–26.

14. CFC's cancellation notice prompted OMCG to file a breach of contract cause of action against CFC and TRI in an Illinois court. Pl.'s Trial Exh. 28. CFC filed in that case an amended third party complaint against TRI seeking return of the deposit funds. Pl.'s Trial Exh. 31.

15. On January 19, 2000 OMCG and CFC reached a settlement and dismissed OMCG's state court complaint with prejudice. Pl.'s Trial Exh. 34. The settlement agreement provided for a final purchase price for the CNC–20. CFC requested that TRI resume efforts to obtain financing, but by this time, TRI had undergone severe financial difficulties and had been dissolved by the Secretary of State in 1999. Pl.'s Trial Exh. 49.

16. CFC took possession of the CNC–20 sometime in January 2000. Czekajlo Tr. 5/22/03 at 23–26.

17. CFC's settlement with OMCG did not release TRI from the state court litigation. On February 20, 2000 CFC amended its complaint seeking to hold Monroe personally liable for the return of the deposit funds. Pl.'s Trial Exh. 36.

18. James Monroe and Taylor Monroe filed their joint bankruptcy petition under Chapter 7 of the Bankruptcy Code on September 9, 2000. Their filing stayed the state court proceedings.

19. Fact statements set forth in the discussion below as to Matters in Dispute, and in the Conclusions of Law, will stand as additional Findings of Fact.

## MATTERS IN DISPUTE

### Representations Regarding the Deposit Funds

CFC contends that the main basis of its agreement with TRI was that the deposit funds would be refundable in the event of unsatisfactory performance by OMCG. Pl.'s Proposed Findings at 5 ¶ 23. CFC did not want to commit itself to a binding contractual agreement until OMCG produced a workable CNC–20. Pl.'s Post–Trial Prop. Findings of Fact and Concl. of Law at 5 ¶ 23. Accordingly, CFC claims that it formed the agreement in reliance on express, oral representations made by Monroe that if the CNC–20 was never completed, or if TRI were unable to obtain financing or the parties did not enter into the lease agreement, the deposit funds, would be refunded. Pl.'s Post–Trial Prop. Findings of Fact and Concl. of Law at 3 ¶ 11. As a result of Monroe's said representations, CFC asserts that the deposit was refundable any time prior to delivery of the equipment. Czekajlo Tr. 5/14/03 at 102–103.

Monroe admits that the deposit funds were to be refunded if the financing or any contingencies failed to occur. Monroe Tr. 5/13/03 at 169. However, Monroe justifies the retention of the deposit as a reasonable approximation of its contract damages resulting from CFC's cancellation letter and breach of the Quotation and Agreement. Def.'s Proposed Findings of Fact and Conclusions of Law at 2; Monroe Tr. 5/13/03 at 168.

### The Anticipated Lease Agreement

Monroe and CFC agree that execution of a binding lease agreement was essential to the transaction. For CFC, the lease agreement was a means to obtain title to the CNC–20. For TRI, the lease agreement was its only way of profiting on the transaction. However, it is clear that execution of the lease depended on financing from Park Bank.

The parties disagree as to whether Park Bank approved financing. Monroe testified that the loan was approved. His corroborating evidence was a phone call from Park Bank, testimony of Ms. Gorski, a representative of Park Bank, and Park Bank's loan committee minutes. Monroe argues that since Park Bank approved the loan, TRI stood willing and able to execute the loan agreement, but recurrent delays in the manufacturing of the CNC–20 prevented it from doing so. Def.'s Am. Prop. Findings of Fact and Concl. of Law at 8 ¶¶ 37–41. However, despite a provisional approval of financing by the Bank's Loan Committee, the loan was never finally approved, documented, or funded (Fact Finding No. 11 above).

CFC relies on the testimony of Ms. Gorski and points to the absence of a final loan agreement or documentation or promissory note. Moreover, Park Bank was not prepared to approve the loan at the interest rate included in Monroe's financial proposal because the Bank required an interest rate of between 11% and 11.25%, Pl's Trial Exh. 60, whereas TRI's financial proposal would have only given Park Bank an

interest rate of 8.5%. Pl.'s Findings of Fact and Concl. of Law at 9 ¶¶ 49–55. Accordingly, the Court has found that Park Bank never approved the loan.

## CONCLUSIONS OF LAW

### Jurisdiction

Core jurisdiction lies under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and the standing referral order under District Court Internal Operating Procedure 15(a). Venue is appropriate under 28 U.S.C. § 1409(a).

### Standards for Dischargeability

■ The discharge provided to debtors in bankruptcy recognizes the Congressional intent of providing the individual bankrupt with a fresh start. Consequently, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Morris,* 223 F.3d 548, 552 (7th Cir.2000).

■ The plaintiff bears the burden of proving its objection to debtor's discharge. Fed.R.Bankr.P. 4005. The burden of proof required to establish such an exception is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re McFarland,* 84 F.3d 943, 946 (7th Cir. 1996), *cert. denied,* 519 U.S. 931, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996).

### False Representation and False Pretenses Alleged in Count I

■ Under 11 U.S.C. § 523(a)(2)(A),

A discharge does not discharge an individual from any debt—

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Plaintiff must therefore prove by a preponderance of the evidence that (i) the debtor made false statements which he knew to be false, or which were made with such reckless disregard for the truth as to constitute willful misrepresentations; (ii) debtor possessed the requisite scienter, i.e. actually intended to deceive the plaintiff, and (iii) to its detriment, the plaintiff justifiably relied on the representations. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Mayer v. Spanel Inter. Ltd.,* 51 F.3d 670, 673 (7th Cir.1995), *cert. denied,* 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995).

### False Statements

CFC claims that Monroe made the following express false representations: That the deposit funds would be used to pay the first and last three months of lease payments under a future equipment lease and that the deposit funds would be refunded if the equipment lease did not materialize. The threshold issue is whether Monroe made these statements with intent to deceive CFC.

### Intent

■ A party may prove intent to deceive through direct evidence or such intent may logically be inferred from a false representation which the debtor knows or should know will induce another to act. *In re Sheridan,* 57 F.3d 627 (7th Cir.1995). Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *Mercantile Bank v. Canovas,* 237 B.R. 423, 428 (Bankr.N.D.Ill.1998).

■ It has been held in this Circuit that when a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists

upon which debt can be held non-dischargeable. *In re Sheridan*, 57 F.3d at 635 ("[p]roof that the debtor never put the money toward the stated purpose allows a court to infer.the requisite intent."); *In re Pappas*, 661 F.2d 82, 86 (7th Cir.1981). Monroe obtained the deposit funds by representing and agreeing that they would be applied to the lease payments. Pl.'s Trial Exh. 12. However, the parties never executed a lease agreement apparently because of delays in the manufacture of the CNC–20 and the absence of final Bank financing commitment.

As stated in *In re Sheridan*, 57 F.3d at 636, "the important question is whether the debtor made use of equivalent amounts of money in the required manner." The trial record has no direct evidence demonstrating that Monroe did not at the time he received the money intend to use the deposit funds towards lease payments. Moreover, Monroe took affirmative steps to ensure that the lease would materialize. He compiled and submitted a financial proposal to Park Bank, submitted a purchase order to OMCG, and attempted to fulfill his duties under the Quotation and Agreement.

When the funding and lease did not materialize, in part because production was delayed, Monroe's company at least had an arguable claim for damages and claim of right to set off that claim against funds then held. Even if that claim lacked merit, it cannot be said that he acted on that claim with fraudulent intent because his company kept and used the funds. There is no evidence that Monroe personally was paid the monies in issue, or that he used the funds deposited with his company for personal expenses.

An additional factor against a finding of fraudulent intent is CFC's cancellation letter. Pl.'s Trial Exh. 25. Czekajlo testified that the letter was intended only to cancel the agreement with OMCG. Yet a reasonable reading of the letter could also support Monroe's testimony that the cancellation letter was a repudiation of the entire transaction, a rejection of the agreement with OMCG and with TRI. As a result of the cancellation letter, Monroe says he believed that the deposit funds could be retained and used by his company as compensation for TRI's partial performance under the Quotation and Agreement. Since Monroe is not shown to have had fraudulent intent there can be no finding of his false misrepresentation or false pretenses.

### Fraud Alleged in Count I

Actual fraud asserted under § 523(a)(2)(A) requires a plaintiff to prove that (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud gave rise to the debt that is the subject of the discharge dispute. *McClellan v. Cantrell*, 217 F.3d 890, 893–894 (7th Cir.2000). *McClellan* further explained that

> "[f]raud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of truth." *Id.* at 893.

CFC's asserted evidence of fraud consists of Monroe's deposition testimony wherein he admitted under cross-examination that under no circumstances would he return the deposit funds. Pl.'s Trial Exh. 56. CFC construes this as an admission that Monroe never intended from the outset to return the deposit funds. Pl.'s Post–Trial Prop. Findings of Fact and Concl. of Law at 17 ¶ 23. However, that is not what

Monroe said.[3] Monroe's actual testimony was consistent with his contention that the cancellation letter repudiated the entire agreement and that he therefore had an off-setting claim. The preponderance of evidence did not show that Monroe had fraudulent intent, and he prevails as to the fraud allegation.

### Fraud, Embezzlement Defalcation and Larceny in Count II

11 U.S.C. § 523(a)(4) provides that a debtor may not receive a discharge from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In order for the Creditor to prevail under this provision, plaintiff must prove that the debtor committed (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny.

### Express Trust or Fiduciary Relationship

■ CFC must therefore establish the existence of an express trust or fiduciary relation, and a debt caused by the Monroe's defalcation or fraud while acting as a fiduciary. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *In re Woldman*, 92 F.3d 546, 547 (7th Cir.1996). A threshold inquiry is whether an express trust or fiduciary obligation runs from Monroe to CFC.

■ The existence of an express trust or fiduciary relationship is tested under federal law standards. *See In re Frain*, 230 F.3d 1014 (7th Cir.2000).

■ Express trusts require an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust. *In re Janikowski*, 60 B.R. 784, 789 (Bankr. N.D.Ill.1986); Robert E. Ginsburg & Robert D. Martin, Ginsburg & Martin on

Bankruptcy § 11.06[G] at 11–104 (4th ed. Supp 2003).

■ Plaintiff alleges that by virtue of its tender of funds, an express trust relationship was created between it and TRI. Pl.'s Post–Trial Prop. Findings of Fact and Concl. of Law at 12 ¶¶ 72–78. Plaintiff finds support for this contention in *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380 (Bankr.N.D.Ill.1994) (Schmetterer, J.) and avers that the case stands for the proposition that an express trust is created where a party acknowledges receipt of a specific amount of money and acknowledges that the money was received for a particular purpose. However, it cannot be found from the evidence in this case that an express trust was created or intended. The intent to create a trust relationship, rather than a contractual relationship, is a key element in determining the existence of an express trust. *In re Schultz*, 46 B.R. 880 (Bankr.D.Nev.1985).

In this case, TRI's duties arose from a contractual agreement. In that agreement, CFC's deposit funds were given in exchange for TRI's performance of its promises and obligations. CFC has not demonstrated, nor is it readily apparent from the documents, how the relationship differed from an ordinary contract relationship requiring payments so as to demonstrate an intent to deposit the monies into a trust.

■ A fiduciary relationship may arise separate from an express trust, *In re Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994) (arising from statute), but it is the substance and character of the debt relationship that determines whether such a fiduciary relationship exists. *In re Littell*, 109 B.R. 874, 881 (Bankr.N.D.Ind.1989).

---

**3.** Question: "Is it your position there was no circumstance under which the $31,000 was to be returned to CFC?" Monroe: "That's my

position." Monroe Deposition June 4th, 2001.

■ Substantial inequity as to knowledge or power between the parties, fiduciary duties and whether these duties arise independently of any contractual relationship between the parties, have been found determinative as to existence of a fiduciary relationship. *Marchiando*, 13 F.3d at 1116; *In re Frain*, 230 F.3d at 1017 (7th Cir.2000). But those factors were not demonstrated here. The Quotation and Agreement does not contain language showing attributes of a fiduciary relationship, and TRI did not hold any fiduciary duties independent and apart from the contractual agreement. Therefore, CFC has failed to establish the existence of an express trust or fiduciary relationship.

### Embezzlement and Larceny

■ Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895)). The creditor must show the debtor appropriated funds for his or her own benefit and the debtor did so with fraudulent intent. *In re Weber*, 892 F.2d at 538.

■ CFC asserts that it never relinquished ownership of the deposit funds. Monroe maintains that it was TRI's intent that the deposit became non-refundable, and thus at all times remained property of TRI, until TRI would substantially fulfill its duties under the Quotation and Agreement. However, the only written agreement between the parties does not specify the circumstances and point in time in which the deposit would become non-refundable or refundable.

A reconciliation of the parties positions as to contract interpretation is not necessary; this Adversary does not involve issues of contractual breach nor can either party seek a re-writing of the terms of their agreement. The analysis is rather specifically confined to asserted fraud and liability arising from fraudulent conduct. Given that Monroe's conduct was at all times consistent with his reasonable understanding of the agreement and the considerable ambiguity as to the exact point in time and circumstances that the deposit may have become refundable, Monroe was not proven to have had the fraudulent intent necessary for embezzlement.

■ Larceny under § 523(a)(4) necessitates a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent. *In re Rose*, 934 F.2d 901 (7th Cir.1991). Larceny was not proven by preponderance of evidence; certainly there was no proof taking the case out of an ordinary commercial issue as to contract deposit monies potentially returnable but subject to claimed offset rights for asserted breach of contract.

Monroe's lack of fraudulent intent also supports a finding that Monroe did not engage in larceny. *In re Rose*, 934 F.2d at 903 (holding that larceny requires that the debtor wrongfully and with fraudulent intent takes property from its owner).

### CONCLUSION

The Debtor–Defendant prevails on Counts I and II, and judgment will separately enter in his favor dismissing this case.