# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2297

In the Matter of:

BERTHA MCGEE,

*Debtor-Appellant.*

GLORIA NELSON and LINDA MITCHELL,

*Creditors-Appellees.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 2061—**Milton I. Shadur**, *Judge.*

———————

SUBMITTED DECEMBER 3, 2003—DECIDED DECEMBER 23, 2003

———————

Before BAUER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Gloria Nelson and her mother Linda Mitchell rented a single-family house in Chicago from Bertha McGee. The lease called for a security deposit of $2,500, which Nelson and Mitchell (collectively "the tenants") paid in cash. McGee put the money in a strongbox—a misstep, as an ordinance requires landlords to invest security deposits in segregated, interest-bearing accounts. When a dispute arose about the condition of the premises, McGee launched an eviction proceeding in state

court; the tenants moved out and filed a counterclaim seeking return of the security deposit. McGee's lawyer in that action counseled her to bank the security deposit in compliance with the ordinance, and she did. Before the state court had resolved the litigation, however, McGee withdrew and spent the money. McGee says that she anticipated that the state court would rule in her favor, so that there was no need to wait for "her" money. The state judge saw things otherwise, determining that the tenants had complied with all of their obligations and that McGee owed double damages plus interest (a total of $5,207.50) for failing to return the security deposit after the tenants quit the premises. Unable (or at least unwilling) to pay this judgment, McGee filed a federal bankruptcy proceeding and sought a discharge. Bankruptcy Judge Squires ruled in McGee's favor, but District Judge Shadur reversed. See 2003 U.S. Dist. LEXIS 7208 (N.D. Ill. Apr. 29, 2003). He found that withdrawal of the security deposit while the state litigation was pending amounted to "defalcation while acting in a fiduciary capacity" and foreclosed the debt's discharge. See 11 U.S.C. §523(a)(4).

As far as we can determine, neither this circuit nor any other has addressed the question whether a landlord's improper retention of a security deposit amounts to "defalcation while acting in a fiduciary capacity" for purposes of §523(a)(4). Perhaps no general answer is possible, for some jurisdictions (or leases) may treat the landlord's position as "fiduciary" while others do not. (There can be no doubt that, if McGee was the tenants' fiduciary, withdrawal and spending the money during the eviction litigation was an act of defalcation. See *Meyer v. Rigdon*, 36 F.3d 1375, 1383-85 (7th Cir. 1994).) It is not hard to imagine arrangements that entitle landlords to treat security deposits as their own while tenancy continues, much as insurance companies may commingle prepaid premiums with general corporate funds

even though they must repay any unearned premium to an insured who cancels the policy before the end of its term. If the lease or governing statute treats the deposit as a form of loan to the landlord in order to create the possibility of a setoff if the tenant later incurs a debt to the landlord, then the tenant becomes an unsecured creditor in bankruptcy. On this understanding, each side's obligation—the tenant's to pay rent and cover any damage, and the landlord's to repay the deposit—is unsecured, which makes the debts "mutual" and readily offset. Likewise, however, it is easy to imagine arrangements, created by contract or statute, that require landlords to treat security deposits as trust funds and thus create fiduciary duties. That is how the district judge read Chicago's ordinance. (As the ordinance supersedes inconsistent terms of any lease, we confine attention to the legislative language.)

Chicago Municipal Code §5-12-080(a) provides:

A landlord shall hold all security deposits . . . in a federally insured interest-bearing account in a bank, savings and loan association or other financial institution . . . . A security deposit and interest due thereon shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the landlord, and shall not be subject to the claims of any creditor of the landlord or of the landlord's successors in interest, including a foreclosing mortgagee or trustee in bankruptcy.

Subsection (c) adds that the interest paid into the interest-bearing account belongs to the tenant. Subsection (d) requires the landlord to provide an accounting and return the deposit (less deductions for unpaid rent and damage to the premises) promptly after the tenant vacates.

Subsection (a) contains five distinct rules: (1) the money must be deposited in an insured account in a financial

institution; (2) the account must earn interest; (3) the funds remain the tenant's property while on deposit; (4) every tenant's deposit must not be commingled with other assets; and (5) the funds "shall not be subject to the claims of any creditor of the landlord". The second requirement— that each account earn interest—is not relevant to analysis under the Bankruptcy Code. Nor is the fifth requirement. Federal law preempts any effort by state and local governments to determine which assets may be reached, for what purposes, by particular creditors. See, e.g., *Perez v. Campbell*, 402 U.S. 637 (1971). The meaning of the words in §523(a)(4) is a question of federal law, see *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000), which state and local governments cannot influence by attaching the word "trust" or any equivalent label to arrangements that lack the normal attributes of those devices. That is why we held in *In re Marchiando*, 13 F.3d 1111 (7th Cir. 1994), that a state law calling the proceeds of lottery-ticket sales "trust funds" had no effect in bankruptcy, for the state had not required retailers to use normal trust devices. The law at issue in *Marchiando* amounted to little more than an effort by the state to prefer its claims as a creditor over those of the retailer's other creditors. Bankruptcy law depends on, and implements, entitlements defined by state law, see, e.g., *Butner v. United States*, 440 U.S. 48, 54 (1979); *In re Wayco*, 947 F.2d 1330, 1332 (7th Cir. 1991) (applying this principle to ascertaining whether a trust had been created), but which of these entitlements is subject to discharge or a trustee's avoiding power is beyond state control. (Unless, of course, Congress decides to recognize local rules, as it has done in providing that debtors may choose between the exemptions provided by federal and state law. See 11 U.S.C. §522(b).)

Chicago Municipal Code §5-12-080(a) does not attempt to give the City a higher place in the priority queue. It is neutral rather than self-preferring legislation. And rules

(1), (3), and (4) do create a trust-like relation between landlord and tenant, the sort of relation that federal law labels "fiduciary." Segregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most "bare" legal title to them, are hallmarks of the trust. These real attributes, not the labels applied by the ordinance, bring into play a fiduciary obligation and thus §523(a)(4). See Douglas G. Baird, *The Elements of Bankruptcy* 52 (rev. ed. 2001). The ordinance charges landlords with duties to be carried out on behalf of tenants, to protect their entitlement to return of deposits with interest if they keep their part of the bargains.

By virtue of the formal separation and ownership rules, the economic relation created by Chicago Municipal Code §5-12-080(a) is more clearly a "fiduciary" one than is the management of a client's funds by a lawyer—and *Maksym v. Loesch*, 937 F.2d 1237, 1241-42 (7th Cir. 1991), holds that a lawyer acts as the client's fiduciary in financial matters even when neither contract nor statute requires segregation of the client's funds. Although we observed in *Marchiando* that many fiduciary relations are characterized by dispari-ties in the knowledge or economic status of the participants, a condition not met here—neither McGee nor the tenants are specialists in the housing market—this is not a *sine qua non*. A plutocrat who puts an investment account of $500,000 at the disposal of a recent high-school graduate for the latter's discretionary financial management may be acting foolishly but has created a fiduciary relation (even if not a formal trust), and if the manager decides to "invest" the account in No. 28 on a roulette wheel then §523(a)(4) will prevent discharge of the debt.

Having demanded and received $2,500 under (statutory) terms designed to ensure that the money would be available for return to the tenants if they kept their own promises, McGee was obliged to act as the tenants' fiduciary in investing and preserving the funds. Instead she made off

with the money, an act of defalcation that disqualifies her from receiving a discharge.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*