**In re Gary E. ZINCK, Debtor.**

**Ronald Holzhueter, et al., Plaintiffs,**

**v.**

**Gary E. Zinck, Defendant.**

**Bankruptcy No. 03–18909–7.**
**Adversary No. 04–00057.**

United States Bankruptcy Court,
W.D. Wisconsin.

Feb. 8, 2005.

918

Richard B. Jacobson, Madison, WI, for Debtor.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

A trial was held in this proceeding to determine dischargeability of a debt under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). No factual basis for the claim under 11 U.S.C. § 523(a)(4) was presented or argued. Plaintiffs Ronald and Katherine Holzhueter testified, as did Defendant Zinck. Plaintiffs submitted a post-trial Brief.

Ronald Holzhueter and Gary Zinck met in 1972, when Zinck was the loan officer who approved the loan for Holzhueter's first investment property. They remained friends, when, in April 1996, Zinck (then a financial advisor with Harbour Investments), approached Holzhueter about investing in "Skylink."

Zinck was enthusiastic about Skylink. He met C.R. Kearns, the president and CEO of Skylink, in June 1996. He visited Skylink's Oregon facilities in August 1996, and made an unannounced visit to Kearns. Kearns was not put off by Zinck's surprise visit, and answered all of Zinck's questions regarding Skylink. Zinck was very impressed. Zinck was further impressed by Kearns' modest lifestyle, believing that Kearns would run his business the same way he lived his personal life—frugally. Zinck invested in Skylink.

Zinck also enlisted the Holzhueters, who, on Zinck's advice, made direct loans to Kearns on promissory notes bearing 10% interest. The Holzhueters were told that the notes were convertible to Skylink stock in the event Skylink went public. Because the notes were from Kearns, and not from Skylink, the Holzhueters were to receive Skylink shares from Kearns' personal holdings. The cash given to Kearns in exchange for notes is referred to as the "Skylink investment" because Zinck and the Holzhueters thought that ultimately they would have Skylink stock.

From August 1996 through February 1997, the Holzhueters exchanged $247,000

for Kearns' personal promissory notes bearing 10% interest. The Holzhueters were not flush with cash. They borrowed and gave second mortgages to get all they invested. Zinck earned $28,000 in commissions from Kearns on the sale of the promissory notes to the Holzhueters. Zinck himself purchased $140,000 of Kearns' notes on which he earned no commission.

Zinck never disclosed to the Holzhueters that he was working directly for Kearns on the Skylink investment. The Holzhueters reasonably assumed that Zinck was working for Harbour Investments, and that the Skylink investment was routed through Harbour. Although he was employed by Harbour investments, for the Skylink investment Zinck was "selling away." Selling away is the practice by an individual broker of selling securities outside the purview of his broker-dealer employer. The result of selling away is that the buyer buys securities that have not been vetted by the broker-dealer, the investor loses a substantial layer of protection, and the broker-dealer is exposed to potential liability. As a practice, selling away is frequently but not always indicative of fraud. It is at least a suspicious endeavor. It raises red flags among industry professionals and watch-dogs. The Holzhueters claim that they would not have purchased the Skylink investment if they had known that the investment was not approved by Harbour Investments. Zinck intentionally withheld the true nature of his agency from the Holzhueters to induce them to purchase the Skylink investment.

By July or August of 1998, Zinck realized that the Skylink investment was bad. Kearns had stopped returning his calls. Zinck started to suspect that the investment would ultimately not pay off on the terms under which it was sold.

Zinck had put all he had in the Skylink investment, and he was out of money. He closed his office in July 1998. On August 27, 1998, the State of Wisconsin Department of Financial Institutions Division of Securities suspended Zinck's securities agent license. He was virtually penniless, but with his father's help, Zinck bought a piece of wooded property, and commenced cutting down trees and building a log cabin. In November or December 1998, Ronald Holzhueter went to Zinck's building site, and helped him with the cabin construction. While there, Zinck told Holzhueter that he was no longer a financial advisor.

In July 1999, Kearns visited Wisconsin. Zinck drove him around to meet various Skylink investors. Zinck and Kearns met with the Holzhueters and discussed the Skylink investment, its non-performance, and possible solutions. Kearns offered to exchange the notes held by Zinck and the Holzhueters for equivalent dollar amounts of Country Maid Financial stock. Zinck told the Holzhueters that he would accept Kearns' offer, but did not recommend to the Holzhueters that they do the same. At this point, the Holzhueters were aware that they were "in way over their heads" and in very real danger of losing their money. But Ronald Holzhueter still chose to follow Zinck. He didn't have the financial acumen to extricate himself with any money, and he thought that hanging on with Zinck was his best chance to come away from the deal with something. He still had tremendous faith in Zinck, despite all the evidence indicating that the investment had seriously soured.

So, the Holzhueters converted the Skylink investment to Country Maid Financial stock. Country Maid Financial stock is now (and probably has at all material times been) worthless or virtually worthless. Zinck lost all of his money, and filed

a voluntary Chapter 7 petition on December 10, 2003. The Holzhueters have lost $247,000, claimed that Zinck was responsible to them for that amount, and filed this adversary proceeding against Zinck to prevent the discharge of that debt.

■■■ I. The initial obstacle for the Holzhueters is that the statute of limitations under Wisconsin securities law has expired. However, in Wisconsin, securities laws do not provide the exclusive remedy for securities fraud. Plaintiffs can allege common law fraud and rely on the common law fraud statute of limitations. "We find no significant reason to conclude the Securities Law should be held to preempt common-law remedies or that its statute of limitations should be applied to fraud actions brought under the common law." *Esser Distributing Co., Inc. v. Steidl,* 149 Wis.2d 64, 437 N.W.2d 884, 886 (1989).

Wis. Stats. § 893.93 states in relevant part:

> (1) The following actions shall be commenced within 6 years after the cause of action accrues or be barred:

> (b) An action for relief on the ground of fraud. The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud.

The Holzhueters filed their Complaint on March 12, 2004. All of the Holzhueters' promissory note transactions with Zinck and Kearns occurred more than 6 years before March 12, 2004. The Holzhueters concede in their post-trial brief that the statute of limitations has expired on all of the promissory note transactions. They further admit that they can only state a § 523(a)(2)(A) claim as to the July 1999 transaction which converted the Skylink notes into Country Maid Financial stock.

The common law fraud statute of limitations begins to run from the "accrual date," not from the transaction date as does the statute of limitations under securities law. Thus, if the Holzhueters learned of the facts constituting the fraud after March 12, 1998, they may be within the statute of limitations. However, there was no proof of the exact date on which the Holzhueters discovered the facts constituting the alleged fraud, and the Holzhueters have effectively waived any claim arising prior to July 1999.

■ II. Section 523 states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ In order to come within § 523(a)(2)(A), the Holzhueters must prove the elements of fraud. Although variously stated in different cases, the "five fingers of fraud" are:

(1) debtor made material false statements

(2) debtor knew the statements were false

(3) debtor intended to deceive the plaintiff

(4) plaintiff justifiably relied on the false statements

(5) plaintiff was damaged

*In re Mau,* 293 B.R. 919, 923 (Bankr. C.D.Ill.2003)

The term "justifiable" replaced "reasonable" in the fourth "finger" after *Field v. Mans,* 516 U.S. 59, 70–71, 116 S.Ct. 437,

133 L.Ed.2d 351 (1995), was decided by the Supreme Court. In that case, the Supreme Court held that the Restatement (Second) of Torts (1976) was to be used to define fraud for § 523(a)(2)(A) purposes.

The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: Although the plaintiff's reliance on the misrepresentation must be justifiable...this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather then of the application of a community standard of conduct to all cases. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

*Field v. Mans,* 516 U.S. at 70–71, 116 S.Ct. 437.

■ The definition of fraud was expanded in *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000), when the Seventh Circuit (Judge Posner writing) held that because § 523(a)(2)(A) contains "false representation" as well as "fraud" that "fraud" is broader than a "false representation." Relying on the analysis of a Kansas intermediate appellate court to describe the common law of fraud, the Court adopted the definition of fraud from *Collier on Bankruptcy*[1] to be "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.*

No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*Id.* But whatever the formulation, the burden was on the Holzhueters to prove every element set out in § 523(a)(2)(A) and cases interpreting it which are controlling on this court. This they have failed to do.

Regarding the July 1999 transaction, the Holzhueters knew that Zinck was no longer a broker, and that he was no longer working for Harbour. Zinck did not give the Holzhueters any advice about what they should do with their notes. Zinck only told them what he was going to do, and he did it. He did not at that time make any false statements that could have been relied on by the Holzhueters. Moreover, there was no deceit, artifice or trick as described in *McClellan v. Cantrell* of which Zinck is guilty. The Holzhueters have failed to prove any fraud by Zinck in 1998 or 1999, and the debt owed to them by Zinck is dischargeable.

■ III. While this case has been decided, it is instructive to review the evidence presented in light of what might

---

1.  4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523–45 (15th ed., Lawrence P. King ed., 2000).

have been. Even if the Holzhueters were not time barred, their claims arising from the 1996 and 1997 transactions would be dischargeable. The Holzhueters failed to prove essential elements of fraud as to those transactions. The Holzhueters have proved that Zinck withheld from them that he was acting as an agent for Kearns, and that he was selling away from Harbour. "An omission or failure to disclose can constitute a misrepresentation if the omission or failure to disclose creates a false impression that is known by the debtor." *In re Harris*, 203 B.R. 117, 121 (Bankr. N.D.Ill.1996).

However, Zinck's omissions were not material. The Holzhueters knew that Zinck was himself investing in Skylink. It was his lead and not his credentials they were following. In the July 1999 transaction, when the Holzhueters knew that Zinck was no longer a financial advisor, they still modeled their investment on what Zinck did. That modeling, not any new representations, caused the Holzhueters to convert the notes to Country Maid stock. It is ironic for the Holzhueters to claim that they would not have purchased the promissory notes in 1996 and 1997 had they known Zinck was not working for Harbour, when in 1999 they copied him in converting their promissory notes to stock when they knew he was no longer working for Harbour. Even if the omissions might generally be considered material, they were not material to the Holzhueters.

The Holzhueters must also prove that Zinck intended to deceive them. That intention may best be proved by circumstances that existed at the time. Zinck was destitute, and he needed to sell Skylink stock to get commissions. Zinck intended to withhold as much information as possible from the Holzhueters so that the Holzhueters did not stop investing in Skylink. But there is no evidence that Zinck

believed or desired that the Holzhueters would be injured by any deception. The more compelling inference from the testimony of both Zinck and the Holzhueters is that Zinck genuinely believed he was letting his friends in on a wonderful opportunity. He was wrong, but he was essentially without guile.

The hardest element for the Holzhueters to prove is that they justifiably relied on the misrepresentations or omissions. At trial, the Holzhueters placed a lot of emphasis on how important it would have been to them to know that Zinck was selling the notes away from Harbour. But unless knowing that Zinck was not an agent of Harbour would have induced them to read the disclosure statements, that knowledge is immaterial. The Holzhueters said that they never read disclosure statements or real estate closing documents. Knowing that Zinck was selling away might have put the Holzhueters on notice that the deal had not been approved by Harbour, but there is insufficient evidence to conclude that the Holzhueters actually relied on the relationship with Harbour in evaluating the investment. The Wisconsin Court of Appeals in *Ritchie v. Clappier*, 109 Wis.2d 399, 326 N.W.2d 131, 134 (1982) held that "Negligent reliance is not justifiable." This is in accord with the standard articulated in *Field v. Mans*. Quoting the Restatement, *Field v. Mans*, 516 U.S. at 71, 116 S.Ct. 437 states:

> Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his

senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

*Ritchie v. Clappier,* 109 Wis.2d at 404, 326 N.W.2d at 134 states:

> Courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him.

While the Holzhueters could not by the use of their senses determine that Zinck was withholding information from them, they could by use of their senses read the documents that they signed. Had they done so, they would have been well advised of the risks they were taking. To say that they took Zinck's word for the quality of the investment without doing any more cannot make Zinck the guarantor of their investment. The Holzhueters' reliance on Zinck alone for the 1996 and 1997 transactions was not justifiable, it was negligent.

■ Zinck was also not acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). The meaning of "fiduciary" in § 523 is stated by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (citations omitted):

> The meaning of these words has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth,* 2 How. 202, 11 L.Ed. 236, decided in 1844, is a decision to the effect that, within the meaning of a like provision in the Act of 1841 (5 Stat. 440), a factor does not act in a fiduciary capacity; the statute 'speaks of technical trusts, and not those which the law implies from the contract.' The scope of the exception was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J.: 'The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created.'

Zinck was not acting as a trustee before the wrong and without reference to it. Zinck was a middleman, and gave the Holzhueters the stock he promised in exchange for their payment. In *In re McGee,* 353 F.3d 537, 540 (7th Cir.2003) the court held:

> The meaning of the words in § 523(a)(4) is a question of federal law...which state and local governments cannot influence by attaching the word 'trust' or any equivalent label to arrangements that lack the normal attributes of those devices.

Zinck's relationship with the Holzhueters did not have the normal attributes of a trust.

The Holzhueters' complaint must be dismissed.

### ORDER

The court having this day entered its memorandum decision in the above-entitled matter,

IT IS HEREBY ORDERED that the Plaintiffs' complaint is dismissed.