**In re Craig N. FOWERS, Debtor.**

**Arthur A. Martello, Plaintiff,**

**v.**

**Craig N. Fowers, Defendant.**

**Bankruptcy No. 04-65316.**
**Adversary No. 05-6064.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Jan. 18, 2007.

Gregory J. Jordan, Esq. and Peter J. Schmidt, Esq. Chicago, IL, for the Plaintiff.

Craig N. Fowers, pro se.

*MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding is before the Court on the Plaintiff's motion for summary judgment. The Plaintiff Arthur A. Martello ("Martello") asserts that the debt owed to him by the Defendant Craig N. Fowers ("Fowers") should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and § 523(a)(6) of the United States Bankruptcy Code ("Code").

Fowers filed a petition for relief under Chapter 13 of the United States Bankruptcy Code on October 22, 2004. On January 4, 2005, this Chapter 13 case was converted to a case under Chapter 7. On April 1, 2005, Martello filed a two count dischargeability complaint against Fowers, alleging that indebtedness owed him by Fowers is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and (a)(6). Fowers, by counsel, filed an answer and affirmative defenses on June 17, 2005 which denied the substantive averments of Martello's complaint. Fowers' counsel was granted leave to withdraw his representation of the Defendant by order entered on August 12, 2005, and thereafter Fowers proceeded *pro se* in all matters before the Court. On March 22, 2006, Martello filed a Motion for Summary Judgment, along with a Memorandum of Law and Statement of Material Facts in support thereof. On March 30, 2006, the Court issued a Notice to Pro Se Defendant of Consequences of Failing to Respond to the Motion For Summary Judgment by the Plaintiff, which advised

Fowers of the requirements of Fed. R.Civ.P. 56 and of the deadline of May 12, 2006 for his response—established by a separate order entered on March 30, 2006. Fowers has failed to file a response of any sort to Martello's motion. The record is now closed on Martello's motion for summary judgment.

## I. *STANDARDS FOR REVIEW OF MOTIONS FOR SUMMARY JUDGMENT*

The procedural mechanism of summary judgment is provided by Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by B.R. 7056. The principle standard to be followed by the Court in determining a motion for summary judgment is stated as follows in F.R.C.P. Rule 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The inquiry that the court must make is whether the evidence presents a sufficient disagreement to require trial or whether one party must prevail as a matter of law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In deciding a Motion for Summary Judgment, the Court should not "weigh the evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Illinois Bell Telephone Co. v. Haines and Co., Inc.,* 905 F.2d 1081, 1087 (7th Cir.1990). However, "if evidence opposing a summary judgment is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 106 S.Ct. at 2511; *Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir.1990).

The moving party bears the burden of showing that there is an absence of evidence to support the non-movant's case; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. at 2548, 2554, 91 L.Ed.2d 265 (1986), i.e., the lack of a genuine issue of material fact. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir. 1984); *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984).

When ruling on a motion for summary judgment, inferences to be drawn from underlying facts contained in such materials as attached exhibits and depositions must be viewed in a light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *See also, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, (1986) (All inferences to be drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party); *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1218 (7th Cir.1984); *Marine Bank Nat. Ass'n. v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987). F.R.C.P. 56(e) requires the nonmoving party to set forth specific facts, which demonstrate that genuine issues of fact remain for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 106 S.Ct. at 1355; the opposing party may not defeat the motion by merely relying on the allegations or denials in its pleadings.

The ultimate *burden* of proof at the trial of this Adversary Proceeding is on the party seeking an exception to discharge, and that party bears the burden of proof as to each element. *Matter of Scarlata,* 979 F.2d 521, 524 (7th Cir.1992); *In re Kreps,* 700 F.2d 372, 376 (7th Cir.1983). *See also, In re Martin,* 698 F.2d 883, 887 (7th Cir.1983), (§ 727 general discharge). In bankruptcy, exceptions to discharge are

to be construed strictly against a creditor and liberally in favor of the Debtor. *In re Scarlata,* 979 F.2d at 524, *supra, quoting, In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

As to the *standard* of proof, it should be noted that the Supreme Court in the case of *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) held that in determining whether a factual dispute exists on a motion for summary judgment, the court must be guided by the substantive evidentiary standards of the case that are applicable at trial. The standard of proof in a § 523(a) nondischargeability adversary proceeding is by a preponderance-of-evidence, rather than the more stringent standard of clear and convincing evidence. *See, Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## II. *MATERIALS TO BE CONSIDERED BY THE COURT*

Fed.R.Civ.P. 56(c) provides that the Court is to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether or not a genuine issue/genuine issues of material fact exist. N.D.Ind.L.B.R. B–7056–1 sets forth certain procedural requirements which must be met to properly present a motion for summary judgment to the Court for decision. Principal among the requirements of that rule is the submission of a "Statement of Material Facts". The purpose of the statement is to identify the facts as to which there is no genuine issue. These facts are to be supported by appropriate citations to the record, i.e. discovery responses, depositions and affidavits. In turn, the responding party is to file a "Statement of Genuine Issues", setting out the material facts with respect to which the responding party asserts that genuine issues of material fact exist.

In this case, the Plaintiff filed a Memorandum of Law in support of his motion, and attached a document entitled, "Arthur A. Martello's Local Rule B–7056–1 Statement of Material Facts", which was supported by two volumes of affidavits and exhibits. The Plaintiff's statement provides as follows:

> Pursuant to Local Rule B–7056–1 of the Rules of the United States District Court for the Northern District of Indiana, plaintiff Arthur A. Martello ("Martello"), by his attorneys, Gregory J. Jordan, Peter J. Schmidt and the firm of Dykema Gossett PLLC, provides the following statement of material facts as to which there are no genuine issues:
>
> 1. Martello is the president and majority shareholder of Able & Willing Services, Inc. ("Able"). See ¶ 3 of Affidavit of Arthur Martello, attached hereto as Exhibit "1."
>
> 2. Prior to November 19, 2004, Martello held liens against Able's assets (the "Assets"). Martello held those liens individually and by assignment from The Bank of Commerce. See Martello Affidavit, ¶ 30, and exhibits thereto.
>
> 3. On November 19, 2004, Martello, as secured creditor of Able, held a public auction of the Assets pursuant to the Uniform Commercial Code (the "UCC Sale"), and purchased the Assets at the UCC Sale. See Martello Affidavit, ¶ 31, and exhibits thereto.
>
> 4. Martello is the holder of Able's claims against Craig Fowers (the "Debtor"). See Martello Affidavit, ¶¶ 30–32, and exhibits thereto.[1]

1. Conceptually, it is necessary to keep in mind in this case that Martello may assert both claims on his own behalf and on behalf of Able by virtue of the fact that he obtained these latter claims through a UCC sale.

5. From January 2001 until December 2004, the Debtor was the President, director and a minority shareholder of Able. During that time, Martello was the majority shareholder in Able. See Martello Affidavit, ¶¶ 3–4; See Debtor's Answer to Plaintiff's Complaint, ¶ 3, attached hereto as Exhibit "2".

6. As President of Able, the Debtor controlled the assets, revenues, employees and operations of Able. See Martello Affidavit, ¶ 5.

7. Prior to January, 2001, Able owned a 1996 Saturn SL1 VIN # 1G8ZH5289TZ264196 (the "Saturn"). See Martello Affidavit, ¶ 9, and exhibits thereto.

8. The Debtor caused Able to sell the Saturn on or about June 24, 2003 for $1,400.00, and retained for his personal use the funds received upon the sale of the Saturn. See Martello Affidavit, ¶ 9, and exhibits thereto.

9. Prior to January, 2001, Able owned a Ford E350 Box Truck, Vin # 1FPKE37HOGHA79779 (the "Ford"). See Martello Affidavit, ¶ 10, and exhibits thereto.

10. The Debtor caused Able to sell the Ford on or about July 2, 2003 for $1,550.00, and retained for his personal use the funds received upon the sale of the Ford. See Martello Affidavit, ¶ 10, and exhibits thereto.

11. Prior to January, 2001, Able owned an International Truck, VIN # 1HTLAHEM2GHA25083 (the "International"). See Martello Affidavit, ¶ 11, and exhibits thereto.

12. The Debtor caused Able to sell the International on or about July 2, 2003 for $2,400.00, and retained for his personal use the funds received upon the sale of the International. See Martello Affidavit, ¶ 11, and exhibits thereto.

13. Prior to January, 2001, Able owned a 1977 Chevy P30 Truck, VIN # 3273313696 (the "Chevy"). See Martello Affidavit, ¶ 12, and exhibits thereto.

14. The Debtor caused Able to sell the Chevy on or about September 20, 2003 for $1,350.00, and retained for his personal use the funds received upon the sale of the Chevy. See Martello Affidavit, ¶ 12, and exhibits thereto.

15. The Debtor caused Able to issue a check payable to "Art Hollis" in the amount of $1,100.00 (the "Able/Hollis Check"). See Martello Affidavit, ¶ 14; See Affidavit of Wayne Wilhoit, ¶¶ 7–8, and exhibits thereto, attached hereto as Exhibit "3".

16. The Debtor directed one of Able's employee to forge the name of Art Hollis on the Able/Hollis check and turn over the funds from the Able/Hollis Check to the Debtor. See Wilhoit Affidavit, ¶¶ 7–8.

17. When the Debtor issued the Able/Hollis check, Able was not indebted to Art Hollis, and Art Hollis made no transfer of funds or value to Able. See Martello Affidavit, ¶ 14.

18. The Debtor hired his wife, Karen Fowers, as an employee of Able. See Martello Affidavit, ¶ 15 and exhibits thereto; See Affidavit of Deanna Simcox, ¶ 17, attached hereto as Exhibit "4".

19. The Debtor caused Able to put Karen Fowers on its payroll and make payments to Karen Fowers in the total amount of $4,489.46. See Martello Affidavit, ¶ 15 and exhibits thereto; Simcox Affidavit, ¶¶ 17–18.

20. Karen Fowers provided no services or other value to Able. See Martello Affidavit, ¶ 15; Simcox Affidavit, ¶ 17; Wilhoit Affidavit, ¶ 9; See Affidavit of Wayne Wilson, ¶ 10, attached hereto as Exhibit "5"; See Affidavit of Matt Cano, ¶ 7, attached hereto as Exhibit "6".

21. The Debtor hired his mother-in-law, Barbara Fabus, as an employee of

Able. See Martello Affidavit, ¶ 16 and exhibits thereto; Simcox Affidavit, ¶ 17.

22. The Debtor caused Able to put Barbara Fabus on its payroll and make payments to Barbara Fabus in the total amount of $41,090.80. See Martello Affidavit, ¶ 16 and exhibits thereto; Simcox Affidavit, ¶¶ 17–18.

23. Barbara Fabus provided no services or other value to Able. See Martello Affidavit, ¶ 15; Simcox Affidavit, ¶ 17; Wilhoit Affidavit, ¶ 9; Wilson Affidavit, ¶ 10; Cano Affidavit, ¶ 7.

24. Barbara Fabus endorsed checks from Able to the Debtor and the Debtor deposited the funds in his personal account. See Affidavit of Peter Schmidt, attached hereto as Exhibit "7".

25. The Debtor caused Able to issue a check dated December 6, 2001 in the amount of $2,800 payable to the Debtor for which the Debtor did not provide any services or other value to Able in exchange. See Martello Affidavit, ¶ 17 and exhibits thereto; Simcox Affidavit, ¶ 18.

26. The Debtor caused Able to issue payments in the amount of $1,749.64 to Sam's Club, in payment of the Debtor's personal purchases. See Martello Affidavit, ¶ 19 and exhibits thereto; Simcox Affidavit, ¶ 18.

27. The Debtor encouraged Able's customers to pay Able's invoices in cash, offering a discount for cash payments. See Simcox Affidavit, ¶ 6; Wilson Affidavit, ¶¶ 4–5; Wilhoit Affidavit, ¶ 5; Cano Affidavit, ¶ 5.

28. The Debtor instructed Able's employees to offer customers a discount for cash payments. See Simcox Affidavit, ¶ 6; Wilson Affidavit, ¶ 5; Wilhoit Affidavit, ¶ 5; Cano Affidavit, ¶ 5. 29. The Debtor took cash payments by Able's customers and retained such funds for his own personal use. See Simcox Affidavit, ¶¶ 6–12 and exhibits thereto; Wilson Affidavit, ¶¶ 6–7; Wilhoit Affidavit, ¶ 6; Cano Affidavit, ¶ 6; Martello Affidavit, ¶¶ 6–8, 20–28 and exhibits thereto.

30. No cash payments received by Able in exchange for goods or services were deposited in Able's bank accounts. See Simcox Affidavit, ¶¶ 7–12 and exhibits thereto; Martello Affidavit, ¶¶ 7–8, 20–26 and exhibits thereto.

31. The Debtor destroyed Able's invoices, receipts and other records in an attempt to conceal his retention of cash payments from Able's customers. See Simcox Affidavit, ¶¶ 7–9, 14–16 and exhibits thereto; Wilson Affidavit, ¶ 6; Martello Affidavit, ¶¶ 8, 22–23.

32. The Debtor instructed Able's employees to destroy Able's invoices, receipts and other records. See Simcox Affidavit, ¶ 15.

33. From January 2001 through December 2002, the Debtor received and retained cash payments by Able's customers in the total amount of $212,866.44. See Simcox Affidavit, ¶¶ 12, 14, 16 and exhibits thereto; Martello Affidavit, ¶¶ 20–25.

34. The Debtor negotiated with Able's customers for barter of goods for the Debtor's personal use in exchange for satisfaction of debt for Able's services. See Simcox Affidavit, ¶ 13; Affidavit of Anthony D'Ortenzio and exhibits thereto, attached hereto as Exhibit "8".

Fowers failed to file a "Statement of Genuine Issues" as is required by N.D.Ind. L.B.R. B–7056–1, and he has failed to respond to Martello's Motion for Summary Judgement in any manner. Nevertheless, Martello's motion cannot be automatically granted: The Court must determine whether Martello is entitled to judgment as a matter of law based upon the record established by Martello. "Where the evidentiary matter in support of the motion [for summary judgment] does not establish

the absence of a genuine issue, summary judgement must be denied even if no opposing evidentiary matter is presented"; *Wienco, Inc., et al. v. Katahn Associates, Inc.*, 965 F.2d 565, 568 (7th Cir.1992); *See also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## III. *LEGAL ANALYSIS*

Exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor; *Matter of Scarlata*, 979 F.2d at 524 (*citing, In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)). The United States Supreme Court has held that the standard of proof in nondischargeability proceedings under § 523(a) is a preponderance-of-evidence standard, rather than the more stringent standard of clear and convincing evidence; *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### A. *The Capacity in Which Martello's Claims Are Asserted*

The record establishes that at the time the conduct alleged to have resulted in nondischargeable indebtedness was being undertaken by Fowers, Martello was the majority shareholder in Able & Willing Services, Inc. and was also a lienholder with respect to the assets of that corporation. Fowers was the President of, and the minority shareholder in, the corporation. Martello subsequently acquired all of the assets of Able at a UCC sale; these assets clearly included all claims and causes of action held by the corporation, including claims which the corporation might assert against Fowers based on the alleged conduct which forms the foundation for this action. Thus, it is potentially possible for Martello individually to seek to assert claims against Fowers based upon the former's status as a shareholder in Able, and based his status as a creditor of Able. He may also assert against Fowers all claims which might be asserted by Able against Fowers.

Under Indiana law, issues regarding the proper party in interest to assert claims of the nature of those being asserted by Martello are somewhat convoluted, and in part are determined by whether or not the corporation itself has third party creditors; *See, In re Arcella–Coffman*, 352 B.R. 677 (Bankr.N.D.Ind.2006). In this case, Able is an Illinois corporation, and thus the laws of the State of Illinois—not of Indiana—presumably control the real party in interest analysis.[2] Martello has posited his claims as being asserted in his capacity as the possessor of the rights of Able against Fowers, and it is in this context that the Court will determine this case.

### B. *11 U.S.C. § 523(a)(4)*

Martello asserts that Fowers' indebtedness to him is excepted from discharge by operation of 11 U.S.C. § 523(a)(4), which provides that a debt is excepted from discharge if the debt is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Whether determined under Illinois law or Indiana law, the "fiduciary" responsibilities of officers and shareholders to a corporation are the same. The President of a corporation has a fiduciary duty to the corporation to manage its assets for the benefit of the corporation, and to not appropriate corporate property for his own personal use; *Unichem Corp. v. Gurtler*, Ill.App., 148 Ill.App.3d 284, 101 Ill.Dec. 400, 498 N.E.2d 724 (1986), *appeal*

2. The Court won't embark on an extended research and analysis project to determine the actual answer to this issue. Martello individually has obtained all of Able's rights and claims vis-a-vis Fowers, and thus there is no need to determine the vagaries of Illinois and Indiana conflicts of law rules in this context.

*den.* 113 Ill.2d 586, 106 Ill.Dec. 57, 505 N.E.2d 363 (Table); *Doherty v. Kahn,* Ill. App., 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163 (1997); *Griffin v. Carmel Bank & Trust Co.,* Ind.App., 510 N.E.2d 178 (1987). Additionally, in a closely held corporation, shareholders owe a fiduciary duty to each other to deal fairly, honestly and openly with the corporation and with fellow shareholders; *McLinden v. Coco,* Ind.App., 765 N.E.2d 606 (2002); *See, Doherty, supra.*

However, the existence of a fiduciary relationship under state law in a corporate context does not a "fiduciary" under 11 U.S.C. § 523(a)(4) make. A critical component of a fiduciary relationship within the scope of 11 U.S.C. § 523(a)(4) is a *res* which exists as the focus of the relationship, much as would be the circumstance in the case of an express trust created to manage property deposited into the trust at the inception of the fiduciary relationship; *In re Tsikouris,* 340 B.R. 604 (Bankr.N.D.Ind.2006). A mere promise to pay a debt when circumstances giving rise to the obligation to pay come into existence, made by an individual to another person or entity of equal or superior standing, is not within the ambit of 11 U.S.C. § 523(a)(4); *In re Woldman,* 92 F.3d 546 (7th Cir.1996). Even if a contract, a statute, or an ordinance labels a relationship to be a "fiduciary" relationship, that label has no consequence under § 523(a)(4) unless there is an existing *res* which is mandated by law to be the subject of the labeled relationship; *In re McGee,* 353 F.3d 537 (7th Cir.2003) [holding that a municipal ordinance which required the deposit of security deposits *paid by tenants* to a landlord into a segregated account, created a "fiduciary" relationship under 11 U.S.C. § 523(a)(4) ].

In *Marchiando v. State of Illinois, Department of the Lottery,* 13 F.3d 1111 (7th Cir.1994), the debtor was a licensed lottery agent for the State of Illinois, and under the contractual provisions of her arrangement with the State and by statute was deemed to be a "fiduciary" with respect to the State of Illinois for monies she received from the sale of Illinois lottery tickets. She failed to remit the proceeds of certain of those sales to the State of Illinois, and when she filed bankruptcy, the State sought to except her liability to it for turnover of the sales proceeds from discharge under 11 U.S.C. § 523(a)(4) on the theory that she was a fiduciary as to the proceeds of sale of the lottery tickets. The State lost in the Seventh Circuit, which held that the relationship did not arise to a "fiduciary" relationship under 11 U.S.C. § 523(a)(4). The teaching of *Marchiando* is not principally that a statutory or contractual designation of an individual as a "trustee" or "fiduciary" has no real relevance to the determination of "fiduciary capacity" under § 523(a)(4). Rather, the primary lesson to be learned from the case is that there must be a "res" in existence *before or at the time* the designated "fiduciary" relationship truly arises.

But that is not the end of the story. In the case of *In re Frain,* 230 F.3d 1014 (7th Cir.2000), the Seventh Circuit departed from traditional § 523(a)(4) analysis by its apparent emphasis on the concept of creation of a "fiduciary capacity" arising from a differential in power or knowledge by an individual in a certain relationship of ascendancy over another individual or individuals. *Frain* involved a closely-held corporation, in which the shareholder interests were held by three individuals, two of whom each had a 25% interest, with Frain having a 50% interest. Frain was the Chief Operating Officer and was authorized to make all decisions affecting normal operations of the corporation. The shareholder agreement prioritized the distributions to be made from the corporation's cash flow. The

two minority shareholders sought to determine that loan indebtedness from shareholder loans was excepted from discharge due to Frain's defalcation in the fiduciary capacity. The opinion, when transparently viewed, focuses solely on a "difference in knowledge or power between fiduciary and principal" which ... gives the former position of ascendancy over the latter (*citing, Marchiando,* 13 F.3d 1111, 1116 (7th Cir.1994)); 230 F.3d at 1017. However, it is a mistake to read *Frain* as stating that a fiduciary relationship arises *solely* from difference in knowledge or power between one individual and another. *Frain* proceeds from the premise that a fiduciary relationship existed between the debtor and the person or entity seeking to assert that relationship under § 523(a)(4), from the debtor's control over an existing *res*—in *Frain,* the assets of a closely held corporation. In other words, it is not merely the differential in power or knowledge between two parties to a relationship that gives rise to a "fiduciary" relationship. In this Court's view, *Frain* is based upon the premise that a "fiduciary" relationship existed between Frain and his two fellow shareholders—much as would be the case in the relationship among a managing partner and limited partners in a partnership—and that this relationship rose to the level of the "fiduciary capacity" required by 11 U.S.C. § 523(a)(4) *because of* the structuring of the relationship in a way which provided Frain with *total* control over the focus of the fiduciary relationship: existing assets of the corporation, and the manner in which the corporation would disburse monies on its obligations.

The record in this case establishes that throughout the period in which Fowers acted to the detriment of the corporation, Martello was the majority shareholder, i.e., Martello presumably had actual control of the corporation by his ability to control the election of directors, and thus his ability to control the appointment/election of officers.[3] This is a close case. Under the principles of *Marchiando,* arguably a "res" existed—tangible and intangible corporate assets—upon which Fowers acted in derogation of his fiduciary obligations. But in *Marchiando,* arguably a "res" existed as well—the lottery tickets sold by the debtor. The distinction between the two circumstances is that the debtor in *Marchiando* had no duty to do anything until the tickets were sold, and thus the "res" of the fiduciary relationship didn't come into existence until a debt to the State was created. In this case, the fiduciary relationship with respect to corporate property existed at any time that the corporation had a property interest in tangible or intangible property, and the disposition of the proceeds of that property was not necessary to give rise to this relationship. *Frain* expanded the concept of a "res" to the closely held corporation context, but in this context added the additional component of a differential in control and power between the defalcating manager/majority shareholder of the corporation and the minority shareholders. Applying the foregoing concepts to the case currently before the Court, there is lacking here the actual lack of control of the actions of Fowers that existed on the part of the minority shareholders in *Frain.* Whether he chose to exercise it or not,

3. The record doesn't establish the relative rights and powers of Martello vis-a-vis control of the board of directors and officers as established by the Articles of Incorporation and By-Laws of Able. It is Martello's burden to establish the elements of his action under 11 U.S.C. § 523(a)(4), and absent evidence to the contrary in the record, the Court assumes that the customary control which can be exercised by the majority shareholder in a closely held corporation adhered to Martello.

based upon the record, Martello presumably had the ascendant control over the corporation and over Fowers' relationship to the corporation. The record is devoid of any facts which support a finding that Fowers was in such a position of ascendancy over the company that he could do whatever he wanted unchallenged. In fact, to the contrary, the record shows that although Fowers was the president and director of the corporation, Martello was the *majority* shareholder. Nothing in the record suggests that Martello, as majority shareholder, was excluded from the day to day operations of the business. Although the Affidavit of Arthur Martello provides evidence that Fowers, "maintained control of Able's assets, revenues, employees and operations" between January 2001 and December 2003—this is not enough. There is nothing in the record that indicates that this control was ***exclusive,*** for throughout that entire time Martello was the majority shareholder. The Court thus cannot determine that there is no genuine issue as to any material fact as to the "difference in knowledge or power between fiduciary and principal" which "... gives the former position of ascendancy over the latter". As a result, Martello's action under the "fiduciary" prong of 11 U.S.C. § 523(a)(4) fails for the purposes of summary judgment.

Martello also asserts that the foregoing debt is excepted from discharge under § 523(a)(4)'s "embezzlement" prong. For the purpose of determining dischargeability, embezzlement and larceny are defined by federal common law. *Valentine v. Valentine,* 104 B.R. 67, 70 (Bankr. S.D.Ind.1988). Embezzlement, under § 523(a)(4), is defined as the fraudulent appropriation of the creditor's property by the debtor to whom it has been entrusted or into whose hands it has lawfully come. *Dobek v. Dobek,* 278 B.R. 496, 509 (Bankr. N.D.Ill.2002) (*citing, Pierce v. Pyritz,* 200 B.R. 203, 205 (N.D.Ill.1996); *see also, Matter of Weber,* 892 F.2d 534, 538 (7th Cir. 1989)). On the other hand, larceny is where the original taking of the property was *not* lawful. *Id.* at 509–10. Embezzlement differs from larceny only in that the original taking was lawful. *In re Rose,* 934 F.2d 901, 903 (7th Cir.1991). As a result, by definition, before a creditor can make a claim of nondischargeability for embezzlement or larceny, it must show that the property allegedly embezzled/"larcened" by the debtor was property of the creditor. *Dobek,* 278 B.R. at 509–10. The record in this case clearly supports a case for embezzlement more than anything else: Fowers had access to, and control over, Able's property by virtue of his position with Able, which property he then appropriated to his own uses.

Embezzlement under § 523(a)(4) has been well-defined by the United States Court of Appeals in the matter of *In re Weber,* 892 F.2d 534, 538–9 (7th Cir.1989):

> Section 523(a)(4) of the bankruptcy code does not allow a debtor to discharge a debt incurred as a result of the debtor's embezzlement. Bankruptcy courts define embezzlement as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895), *quoted in In re Bevilacqua,* 53 B.R. 331, 333 (Bankr.S.D.N.Y.1985), *In re Myers,* 52 B.R. 901, 905 (Bankr. E.D.Va.1985), *In re Graziano,* 35 B.R. 589, 594 (Bankr.E.D.N.Y.1983); *see also In re Belfry,* 862 F.2d 661, 662 (8th Cir.1988). To prove embezzlement, the creditor must show by clear and convincing evidence that (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. *In re Taylor,* 58 B.R. 849, 855 (Bankr.E.D.Va. 1986); *In re James,* 42 B.R. 265, 267 (Bankr.W.D.Ky.1984); *In re Storms,* 28

B.R. 761, 765 (Bankr.E.D.N.C.1983); *Graziano,* 35 B.R. at 595.

Ablan initially argues that the bankruptcy court should have applied the embezzlement and conversion laws of Wisconsin. Although he cites no authority for this proposition, and admits that ultimately the issue of nondischargeability is a question of federal law, he claims that state law is "useful" in defining the elements of embezzlement. Ablan claims that the Wisconsin cases he cites "do not in any event conflict with the [federal standards]"; his analysis of this case law, however, leads him to conclude that "[t]he act of depositing [another's] funds into one's account, thereafter causing them to be dispersed for one's own purposes or uses is the kind of evidence which *would compel the conclusion that embezzlement has occurred.*" (emphasis added). Under federal law, such a conclusion is not compelled since the creditor must also prove that the dispersal occurred with fraudulent intent. Thus, Ablan had to prove more than just the fact that Weber used the sales proceeds to pay off his personal debts; he had to prove that Weber did so with fraudulent intent.

The element of fraudulent intent is a constant in federal decisions under § 523(a)(4)'s "embezzlement" and "larceny" prongs; *See,* e.g., *In re Dempster,* 182 B.R. 790, 802 (Bankr.N.D.Ill.1995); *In re Fields,* 2005 WL 2205787 (Bankr.C.D.Ill. 2005); *In re Brady,* 101 F.3d 1165, 1172–3 (6th Cir.1996); *In re Rogstad,* 126 F.3d 1224, 1228 (9th Cir.1997); *In re Fuget,* 339 B.R. 702, 707 (Bankr.S.D.Iowa 2006); *In re Lammers,* 2005 WL 1498336 (Bankr. M.D.Fla.2005). Therefore, in order to sustain an action for "embezzlement" or "larceny" under 11 U.S.C. § 523(a)(4), the plaintiff must establish not only that the debtor exercised unauthorized control over the property of another, but also that the debtor had fraudulent intent in doing so.

The record in this case clearly establishes an action for embezzlement under 11 U.S.C. § 523(a)(4). The uncontested facts presented to the Court demonstrate that Fowers sold several automobiles belonging to Able, without Able's consent, and then pocketed the proceeds for his own personal use. With at least one of the vehicles, the transfer was creatively accomplished through forgery: "[t]he debtor directed on of Able's employee to forge the name of Art Hollis on the Able/Hollis check and turn over the funds for the Able/Hollis check to the Debtor" (*See,* Statement of Material Facts at ¶ 16). A payment of $1100. was made to an Art Hollis, for which the corporation's records establish no basis or underlying debt. The facts presented to the Court also present a scheme whereby the debtor managed to establish two 'ghost payrolls' for two family members—Barbara Fabus and Karen Fowers. As the evidence shows, these individuals were paid by Fowers but never made an appearance at work, nor did they otherwise provide services or value of any kind to Able. In the end, $45,580.26 was paid out by Able to these individuals. Fowers caused an unauthorized payment of $2800.00 to be issued to himself, $450.00 to be paid for work done to his home, and $1,749.64 to be paid to Sam's Club for Fowers' personal purchases. The *coup de grace* is evidence of Fowers' instructing Able's employees to offer customers a discount for cash payments for work done by Able, of Fowers' retaining such funds for his own use, and of his then instructing employees to destroy Able's business records in order to remove evidence of these transactions. The debtor managed to embezzle $212,866.44 with this scheme. Fowers even managed, at least in one circumstance, to 'barter' Able's services for jewelry. The total loss to Able from these actions was $265,221.34. [Affidavit of Ar-

thur A. Martello in Support of Motion For Summary Judgment, ¶¶ 9–26].

Based on the foregoing, the Court finds that there is no genuine issue as to any material fact that the Defendant fraudulently embezzled property of Able in the amount of $265,221.34, and that Fowers' debt to Martello as the acquirer of the assets of Able in the amount of $265,221.34 is excepted from discharge under 11 U.S.C. § 523(a)(4).

C. *11 U.S.C. § 523(a)(6)*

Martello also posits the argument that this debt is excepted from discharge under 11 U.S.C. § 523(a)(6), which in pertinent part states:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> ...
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

In the case of *In re Whiters,* 337 B.R. 326 (Bkrtcy.N.D.Ind.2006), the Court determined that in order to sustain an action under 11 U.S.C. § 523(a)(6), a creditor must demonstrate the following:

1. That the Debtor's actions caused an "injury" to the person or property interest of the creditor.
2. That the debtor's actions which caused the injury were the result of "willful" conduct by the debtor by which the debtor intended to effect an injury to the person or property interest of the creditor.
3. That the debtor's "willful" acts were undertaken in a "malicious" manner.

As this Court recognized in *Whiters,* it is difficult to establish the foregoing in a default judgment or summary judgment type of proceeding. Some courts have developed a standard—rejected in *Whiters*—that the "willful" element may be established by proof that there was an "objective substantial certainty of harm" with respect to the debtor's actions. It is this Court's view that the "willful" element depends upon the defendant's/debtor's *subjective* state of mind, and that this state of mind must be established at least by circumstantial evidence. As the Sixth Circuit stated in the matter of *In re Markowitz,* 190 F.3d 455, 464 (6th Cir.1999):

> The Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences. Nonetheless, from the Court's language and analysis in *Geiger,* we now hold that unless "the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it," Restatement (Second) of Torts § 8A, at 15 (1964), he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

The "malicious" element has been defined by the Seventh Circuit as, "[the] conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *See, in re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994).

The issue comes down to whether the record establishes that Fowers *subjectively* intended to inflict injury on the property interests of Able, and if so, whether he did so maliciously. The Court deems the

record sufficient to establish that there is no genuine issue as to any material fact that Fowers' acts of misappropriation were "malicious", i.e., there was no just cause or excuse for those acts. However, while the record establishes a clear pattern of intended acts which adversely affected Able's property interests, there is no direct evidence of Fowers' state of mind in doing so. As discussed at length in *Whiters,* the United States Supreme Court's decision in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) has jumbled the law under 11 U.S.C. § 523(a)(6): the distinction between an intentional act which causes harm, and an act done to intentionally cause harm, is extremely difficult to define and to consistently theoretically enunciate and apply. Perhaps the best analogical distinction arises in the context of the common collateral conversion case, in which a debtor unauthorizedly sells property in which a creditor has a security interest. On the one extreme is the debtor who does so in a transaction in which he intends to then turn over the proceeds of the sale to the creditor, but gets stiffed by his buyer. Assuming these facts, the intended disposition was not accomplished with an intent to deprive the creditor of the proceeds of the collateral, and was thus not subjectively intended to harm the creditor's interest in the collateral. On the other extreme is the debtor who sells the collateral, receives full payment from the buyer, and then disappears without any contact with the creditor and without turning over any of the sales proceeds to the creditor. One can safely infer from this scenario that the debtor intended to harm the creditor's interest in the property. Most cases fall between these two extremes. In the instant case, the facts are that multiple misappropriations were effected by Fowers; that these misappropriations were accomplished in part by Fowers' directions to corporate employees to keep them under wraps; that Fowers destroyed, or caused to be destroyed, certain records to preclude tracing of certain transactions; that the corporation's financial circumstances dramatically declined during the course of the misappropriations; and that nothing was ever repaid by Fowers to the corporation. Even though Fed.R.Civ.P. 56 requires that inferences be drawn in favor of the party opposing the summary judgment—and putting aside the fact that Fowers did not actively oppose Martello's motion—the record supports the determination that there is no genuine issue as to any material fact that Fowers subjectively intended to injure the property interests of Able by his actions.

The Court thus finds that there is no genuine issue as to any material fact that the Defendant intentionally and maliciously injured property interests of Able in the amount of $265,221.34, and that Fowers' debt to Martello, as the acquirer of the assets of Able, in the amount of $265,221.34 is excepted from discharge under 11 U.S.C. § 523(a)(6).

## IV. *CONCLUSION*

IT IS ORDERED, ADJUDGED AND DECREED that Arthur A. Martello is entitled to judgement against Craig N. Fowers in the amount of $265,221.34, and that said indebtedness is excepted from the discharge granted to Craig N. Fowers in Case Number 04-65316 under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6).